## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

CARL GIESLER, JR.,

      Plaintiff and Counterclaim
      Defendant,

v.

SANDRIDGE ENERGY, INC.,

      Defendant and Counterclaim
      Plaintiff.

Case No. CIV-21-0904-HE

## DEFENDANT SANDRIDGE ENERGY, INC.'S ANSWER AND COUNTERCLAIMS

Defendant SandRidge Energy, Inc. ("SandRidge" or "Defendant"), by and through its counsel, responds as follows to the allegations set forth in the Complaint filed by Carl Giesler, Jr. ("Giesler" or "Plaintiff") dated September 15, 2021 (the "Complaint"), ECF No. 1. To the extent not specifically admitted, modified, or qualified herein, all of the allegations of the Complaint are denied. Defendant bases its responses on its knowledge as to its own activities, and on information and belief as to the activities of others. The numbered paragraphs below correspond to the numbered paragraphs in the Complaint.

## PRELIMINARY STATEMENT

In April 2020, SandRidge, a publicly traded company, hired Giesler as its President and Chief Executive Officer pursuant to an employment agreement that was intended to incentivize Giesler to remain at SandRidge long-term. But a mere fifteen months later, Giesler quit, after having been compensated more than $2 million in cash and stock. Now,

Giesler claims that, contrary to the plain meaning of the agreement, industry standards, the parties' negotiations, and common sense, he is entitled to a windfall of an additional 284,323 Restricted Stock Units—with a value of more than $1.5 million as of the date of his resignation—pursuant to an unreasonable interpretation of such agreement, an interpretation he never disclosed to SandRidge's Board or shareholders until making his demand, despite being obligated to do so (including based on SEC disclosure requirements).  Indeed, despite putting in only fifteen months of work, Giesler claims that he is entitled to an additional payout of stock valued at more than four times his annual salary.  In other words, Giesler seeks to reap a massive windfall for quitting.  This illogical and absurd reading of the agreement must be rejected, and Giesler's claims denied.

## PARTIES

1.      SandRidge lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore denies them.

2.      SandRidge admits that it is a corporation formed under the laws of the state of Delaware and that its headquarters is located in Oklahoma City, Oklahoma.  SandRidge admits that The Corporation Company is a registered agent of SandRidge and that its address is 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

## JURISDICTION AND VENUE

3.      This paragraph contains legal conclusions to which no response is required. To the extent a response is required, SandRidge admits that the matter in controversy exceeds the value of $75,000 but lacks knowledge or information sufficient to form a belief as to whether the parties are citizens of different states.

4.      For the purposes of this action only, SandRidge does not contest personal jurisdiction in this matter and admits that its headquarters are in Oklahoma City, Oklahoma, but denies the remainder of the allegations in this paragraph.

5.      For the purposes of this action only, SandRidge does not contest venue in this matter, but denies the remainder of the allegations in this paragraph.

## RESPONSE TO STATEMENT OF FACTS

6.      Denied except Sandridge admits that SandRidge and Giesler executed a written agreement regarding Giesler's employment at SandRidge (hereafter, the "Employment Agreement"), and refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith.

7.      This paragraph contains legal conclusions to which no response is required. To the extent a response is required, SandRidge denies the allegations in this paragraph. To the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith.

8.      To the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith. SandRidge otherwise denies the remaining allegations in this paragraph.

9.      To the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its

full and complete contents and denies any characterizations inconsistent therewith. SandRidge otherwise denies the remaining allegations in this paragraph.

10.   Sandridge admits that Giesler served as Chief Executive Officer of SandRidge.  To the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith. SandRidge otherwise denies the remaining allegations in this paragraph.

11.   SandRidge denies the allegations in Paragraph 11.

12.   To the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith. SandRidge admits that Giesler resigned from his position as Chief Executive Officer of SandRidge on or around July 16, 2021.  SandRidge otherwise denies the remaining allegations in this paragraph.

13.   To the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith. SandRidge otherwise denies the remaining allegations in this paragraph.

14.   This paragraph contains legal conclusions to which no response is required. To the extent a response is required, and to the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent

therewith.  SandRidge admits that Giesler resigned from his position as Chief Executive Officer of SandRidge on or around July 16, 2021.  SandRidge otherwise denies the remaining allegations in this paragraph.

15.    This paragraph contains legal conclusions to which no response is required. To the extent a response is required, and to the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith.  SandRidge admits that Giesler resigned from his position as Chief Executive Officer of SandRidge on or around July 16, 2021.  SandRidge otherwise denies the remaining allegations in this paragraph.

16.    This paragraph contains legal conclusions to which no response is required. To the extent a response is required and to the extent the Complaint purports to quote from or characterize the Employment Agreement or the 2016 Omnibus Incentive Plan (as Amended and Restated as of Aug. 9, 2018 (hereafter, the "Incentive Plan"), SandRidge refers the Court to a copy of those documents for their full and complete contents and denies any characterizations inconsistent therewith.  SandRidge admits that Giesler resigned from his position as Chief Executive Officer of SandRidge on or around July 16, 2021. To the extent the Complaint purports to quote from or characterize public statements made by SandRidge at the time of Giesler's resignation, SandRidge refers the Court to a copy of those public statements for their full and complete contents and denies any characterizations inconsistent therewith. SandRidge otherwise denies all other allegations contained in this paragraph.

17.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required and to the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith.  SandRidge otherwise denies all other allegations contained in this paragraph.

18.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required and to the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith.  SandRidge otherwise denies the remaining allegations in this paragraph.

19.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required and to the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith.  SandRidge otherwise denies the remaining allegations in this paragraph.

20.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required and to the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith.  SandRidge otherwise denies the remaining allegations of this paragraph.

21.     SandRidge admits that Giesler made a demand for certain restricted stock units and that SandRidge rejected Giesler's demand but otherwise denies the allegations in this paragraph.

## RESPONSE TO CAUSE OF ACTION

22.     In response to this paragraph, SandRidge incorporates by reference its responses to paragraphs 1-21 as though fully set forth herein.

23.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, SandRidge admits that SandRidge and Giesler executed the Employment Agreement.  To the extent the Complaint purports to quote from or characterize the Employment Agreement, SandRidge refers the Court to a copy of that agreement for its full and complete contents and denies any characterizations inconsistent therewith.  SandRidge otherwise denies the remaining allegations of this paragraph.

24.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, SandRidge denies the allegations in this paragraph.

25.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, SandRidge denies the allegations in this paragraph.

## RESPONSE TO PRAYER

SandRidge denies that Giesler is entitled to any of the relief requested in his Prayer, or to any relief whatsoever from SandRidge.

## AFFIRMATIVE DEFENSES

Without prejudice to the denials set forth in this Answer, SandRidge further responds to the Complaint with the defenses set forth below.  SandRidge expressly reserves

7

the right to supplement this Answer, including the right to assert additional defenses as more information is learned through discovery and further factual investigation in this case. SandRidge does not intend to hereby assume the burden of proof with respect to those matters as to which, pursuant to law, Plaintiff bears the burden of proof.

## FIRST AFFIRMATIVE DEFENSE

Defendant incorporates by reference and asserts each of the defenses listed in Federal Rule of Civil Procedure 8(c)(1).

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state a claim for which relief can be granted.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any damages.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because to the extent Plaintiff suffered any injury, such injury was a result of Plaintiff's own conduct and/or failure to comply with the terms of any relevant and applicable contract(s) or law(s).

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate damages, if any.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of after-acquired evidence.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of waiver, laches, unclean hands, and/or estoppel.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's fraudulent conduct, deceit, or misrepresentations.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendant has fully or substantially performed any and all contractual obligations.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff is barred, in whole or in part, from recovering from Defendant on any alleged contract, because Defendant's performance was excused by Plaintiff's breach of the alleged contract.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff is barred, in whole or in part, from recovering from Defendant because of Plaintiff's breach of the implied covenant of good faith and fair dealing.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff is barred, in whole or in part, from recovering from Defendant on any alleged contract, because Defendant's performance was excused by Plaintiff's anticipatory breach of the alleged contract.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the equitable doctrine of unjust enrichment.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff is barred, in whole or in part, from recovering from Defendant on any alleged contract because the contract is ambiguous and parol evidence bars Plaintiff's claim.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff is barred, in whole or in part, from recovering from Defendant on any alleged contract because the alleged contract was based on unilateral mistake or mutual mistake.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff is barred, in whole or in part, from recovering from Defendant on any alleged contract, because of the doctrine of frustration of purpose.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff is barred, in whole or in part, from recovering from Defendant on any alleged contract, because any such contract was rescinded and/or needs to be reformed due to Plaintiff's own acts and omissions.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff cannot recover consequential damages because the relevant agreement(s) do not specifically provide for such damages.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff is barred, in whole or in part, from recovering costs or attorneys' fees in this action.

## COUNTERCLAIMS

In addition to its Answer to Plaintiff's claims, SandRidge Energy, Inc., as Counterclaim Plaintiff, hereby asserts Counterclaims against Plaintiff Carl Giesler, Jr., as Counterclaim Defendant, as follows:

## INTRODUCTION

1.      SandRidge[1] hired Giesler as President and CEO on April 6, 2020 with an incentive to remain at SandRidge long-term.  Instead, Giesler abandoned the company after fifteen months.

2.      Pursuant to the Employment Agreement, SandRidge paid Giesler an annual salary of three hundred and fifty thousand dollars ($350,000) and provided a "target bonus" of fifty percent of his annual salary.  SandRidge also provided him with a "Long-Term Incentive Award" of one million Restricted Stock Units ("RSUs").  A third of those units vested on the one-year anniversary of the Employment Agreement, and when Giesler filed his Complaint on September 15, 2021, those vested shares were worth more than $4 million (the majority of value having accrued in the months *after* Giesler left the company).  The Employment Agreement provided that the remaining RSUs would vest in equal portions on the second and third anniversaries of the Agreement.  The purpose of such provision

---

[1] All capitalized terms not defined herein have the same meaning as those defined in SandRidge's Answer to the Complaint.

was to incentivize Giesler to remain at SandRidge long-term; thereby providing stability to the company and its leadership team.  But instead, Giesler quit after just 15 months.

3.      Now, Giesler has filed a lawsuit claiming that, notwithstanding his voluntary resignation, he is entitled to more than 40% of these unvested RSUs because his "employment was terminated."  Critically, however, such language was included in the Employment Agreement to provide Giesler with a remedy should *Sandridge* terminate Giesler's employment—a commonsense reading supported by the plain language of the agreement itself (*e.g.*, using the word "termination" rather than "resignation"), industry standards, and common sense.  Indeed, it makes no sense for a "Long-Term Incentive Award" to financially incentivize the exact opposite by encouraging Giesler to abandon the Company.

4.      Equally important, Giesler never disclosed his purported interpretation of the Employment Agreement to SandRidge's Board or shareholders until at or around the time of his resignation.  He did not disclose it when the Parties were negotiating or executing the Agreement.  He did not disclose it when he reviewed, approved, and presented to the Board a draft 2021 Proxy Statement that discussed his compensation.   And he did not disclose it during SandRidge's Say-On-Pay process during the 2021 Proxy season.  Giesler also failed to file an SEC Form 4—a "Statement of Change of Beneficial Ownership"— disclosing his interpretation, which is a mandatory SEC disclosure for officers of registered companies.  Rather, Giesler kept his interpretation hidden from the Board and shareholders until *after* he announced his intention to quit.

5.      Given Giesler's eleventh-hour claim, one of two things must be true: either Giesler held his interpretation the entire time yet concealed this information he had a duty to disclose, thus eliminating any meeting of the minds on this material provision to the Employment Agreement, or Giesler concocted his illogical and commercially unreasonable interpretation after-the-fact to obtain RSUs he had not earned.  Either way, Giesler seeks to be rewarded for quitting in the way of a windfall of 284,323 RSUs—valued at nearly $1.5 million as of his resignation—in addition to the millions of dollars that he has already been compensated—for a mere fifteen months of work.

## PARTIES

6.      SandRidge Energy, Inc. is a Delaware Corporation with its headquarters located in Oklahoma City, Oklahoma.  SandRidge is a publicly traded company listed on the New York Stock Exchange with the Stock Ticker Symbol "SD."

7.      Counterclaim Defendant Carl Giesler, Jr. is, upon information and belief, a citizen and resident of the state of Texas, and can be served with process through his counsel in this matter.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction because the amount in controversy exceeds the value of $75,000 and, upon information and belief, the Parties are citizens of different states, pursuant to 28 U.S.C. § 1332(a).

9.      This Court has personal jurisdiction over Giesler because Giesler contractually consented to personal jurisdiction in this Court and waived the right to contest

such personal jurisdiction.  Giesler has further consented to personal jurisdiction in this Court by virtue of the filing of his Complaint in this Court.

10.    Venue is proper in this Court based on the Parties' contractual agreement.

## STATEMENT OF FACTS

**A.  *Giesler Withholds Material Information During Negotiation of the Employment Agreement***

11.    Giesler joined SandRidge as President and Chief Executive Officer in April 2020, following his tenure at Jones Energy, Inc., which had recently filed for Chapter Eleven bankruptcy.

12.    Giesler represented himself as a sophisticated, seasoned, and experienced executive, and is a graduate of Harvard Law School.  He came to SandRidge promising to "right-size" the company.

13.    A primary topic of Giesler's contractual negotiations with SandRidge was the Long-Term Incentive Award memorialized in Giesler's Employment Agreement, as well as in SandRidge's Incentive Plan.

14.    As the term "Incentive Award" makes clear, the award of Restricted Stock Units was intended to *incentivize* Giesler to remain at SandRidge "long-term," not to reward an early voluntary resignation.  Accordingly, pursuant to the Employment Agreement, Giesler would receive 1,000,000 RSUs "vest[ing] in three equal installments on each of the first, second, and third anniversaries of the" Employment Agreement.  In addition, should *SandRidge* "terminate" Giesler for any reason other than for cause, Giesler would receive a portion of the unvested RSUs pursuant to a formula in the Employment

14

Agreement.  If SandRidge terminated Giesler for cause, however, Giesler would forfeit all RSUs pursuant to the Long-Term Incentive Award, including those that had already vested. The word "resignation" is commonly used in the industry to refer to the voluntary resignation by an employee, but that word itself was not included in the Employment Agreement.

15.    At the time it entered into the Employment Agreement with Giesler, and based on the plain and commonsense reading of the Agreement, SandRidge reasonably believed that Giesler would not receive any additional RSUs (*i.e.*, no additional RSUs would vest) if Giesler voluntarily resigned.  SandRidge also reasonably understood and believed that Giesler shared this understanding, as the parties discussed this understanding prior to execution of the Employment Agreement and Giesler never expressed an opinion to the contrary.  But, upon information and belief, and if his complaint is taken at face value, Giesler harbored an alternate understanding at the time of drafting.

16.    In addition, the Employment Agreement specifically provides that the Long-Term Incentive Award is "subject to the terms and conditions of the Incentive Plan," a separate document.   The Incentive Plan, among other things, grants SandRidge's Compensation Committee the sole discretion and absolute binding authority to construe and interpret terms and provisions in the Incentive Plan and any awards granted pursuant thereto, including the Long-Term Incentive Award.  Pursuant to the Incentive Plan, "[a]ny decision, interpretation or other action made or taken in good faith by [SandRidge] arising out of or in connection with the Plan . . . shall be final, binding and conclusive on the Company and all employees and Participants[.]"   On August 6, 2021, after receiving

Giesler's demand and before he filed his lawsuit, SandRidge's Compensation Committee construed and interpreted the Long-Term Incentive Award, memorializing its determination in the August 6, 2021 Resolutions of the Compensation Committee of the Board of Directors:

> [T]he Committee carefully considered all relevant facts, documents (including the [Incentive] Plan, [Giesler's] Demand Letter, and [Giesler's] Employment Agreement, which contains the terms of Mr. Giesler's RSU award and constitutes his Award Agreement (as defined under the Plan)), and the circumstances of Mr. Giesler's voluntary resignation from the Company[.]

and resolved to:

> reject Mr. Giesler's demand of 284,323 RSUs; and interpret the relevant language in the [Incentive Plan] to mean that RSUs vest only upon involuntary termination.

### B. *Giesler Announces His Resignation and Makes his Demand, Disclosing His Long-Term Incentive Award Interpretation for the First Time*

17.    Giesler did not reveal to SandRidge's Board or shareholders his purported interpretation that the Long-Term Incentive Award would provide him with a windfall in the event he voluntarily resigned until at or around the time of his resignation.  If his complaint is taken at face-value, and upon information and belief, Giesler always held this belief and, as described herein, never timely disclosed this material information to SandRidge's Board or shareholders.  Alternatively, if Giesler did not have his now-articulated understanding of the Long-Term Incentive Award at the time of drafting, his after-the-fact concocted interpretation is merely an attempt to line his pockets on his way

out the door, despite receiving compensation from Southwestern for forfeited long-term incentives.

18.     Giesler first notified SandRidge's Board that he intended to resign in or around the first week of July 2021, and his resignation became effective on July 16, 2021. It was not until this time that SandRidge's Board learned of Giesler's interpretation of the Long-Term Incentive Award.

19.     Upon learning of Giesler's interpretation, SandRidge's Board was surprised for several reasons. *First*, Giesler's interpretation is facially unreasonable, illogical, and inconsistent with industry standards. The Long-Term Incentive Award was designed to do just that—*incentivize* Giesler to remain at SandRidge long-term, as is typical of long-term incentive awards (to promote retention, not resignation).   Giesler's interpretation, to the contrary, would financially incentivize his early *voluntary resignation*—in other words, it would reward him for quitting.  Furthermore, the plain meaning of the provision uses the word "termination," not "resignation," which is the common industry word used to describe the situation where an employee voluntary resigns.  Indeed, prior drafts of the Employment Agreement emphasized this distinction and support the interpretation that Giesler would not be entitled to additional RSUs following a voluntary resignation, and the ultimate Employment Agreement merely simplifies and clarifies this self-evident concept.

20.     *Second*, this interpretation was never discussed when the Parties were negotiating Giesler's Employment Agreement.  To the contrary, the Parties discussed the very opposite—that Giesler would not receive any additional vesting of RSUs under the Long-Term Incentive Award if he were to resign.   Indeed, SandRidge would not have

provided the initial RSU grant under the Long-Term Incentive Award, nor any vesting thereunder, without the expectation, and contractual agreement, that Giesler would remain at SandRidge "Long-Term" and be incentivized to do so.

21.     *Third*, Giesler failed to timely disclose his interpretation of the Long-Term Incentive Award to SandRidge's Board or shareholders during his tenure as CEO at SandRidge, including when preparing and reviewing mandated disclosures regarding his compensation.

22.     Indeed, SandRidge's draft 2021 Definitive Proxy Statement, which Giesler reviewed, approved, and presented to the Board, addressed SandRidge executive compensation, including incentive compensation.  But the draft Proxy Statement made no mention of Giesler's supposed view that additional RSUs would vest upon an executive's voluntary resignation.   This makes sense, as a commonsense plain reading of the Employment Agreement makes clear that these RSUs would only vest if *SandRidge* terminated Giesler.  But nevertheless, if Giesler had held this alternate interpretation, he had a duty to disclose such information to the Board.   Similarly, when SandRidge conducted a shareholder advisory vote on executive compensation (commonly referred to as "Say-On-Pay") in 2021, Giesler did not mention his non-standard and commercially unreasonable reading at any point.   Further, as described above, Giesler had a duty to disclose his interpretation in an SEC Form 4, which he failed to do.

### C. *Giesler Seeks a Double Recovery*

23.     A mere fifteen months into his tenure at SandRidge, Giesler had sought new employment elsewhere and ultimately accepted a job as the Chief Financial Officer of

Southwestern Energy Company ("Southwestern").  At the same time Giesler was announcing his voluntary resignation at SandRidge and making his demand for additional RSUs, his new employer publicly acknowledged in an SEC filing that Giesler was being compensated for forfeited "long-term incentives" from SandRidge.

24.     Tellingly, on July 15, 2021, the day before Giesler's resignation from SandRidge became effective and the same day Southwestern announced Giesler's appointment as its new Executive Vice President and Chief Financial Officer, Southwestern filed a Form 8-K disclosing Mr. Giesler's compensation in his new position and suggesting Giesler used the fact of his forfeiture of SandRidge long-term incentives to sweeten his deal with Southwestern.  In it, Southwestern stated that "[t]o compensate [Giesler] in part for long-term incentives forfeited upon his resignation from his current position, he will receive a one-time cash bonus in the amount of $500,000 payable upon the one-year anniversary of the commencement of his employment and a one-time grant of 130,675 shares of common stock of the Company, which will ratably vest annually over three years."

25.     Yet, despite this compensation, and with this new position secure, Giesler attempted to seek a double-recovery and made his demand for additional RSUs based on a commercially unreasonable purported interpretation of the Long-Term Incentive Award.

## CAUSE OF ACTION

### COUNT I
### Declaratory Judgment

26.     SandRidge incorporates by reference all of the prior paragraphs, as if fully set forth herein.

27.     As described above, Giesler purportedly maintained a non-standard, commercially unreasonable, and illogical interpretation of the Long-Term Incentive Award in the Employment Agreement and SandRidge's Incentive Plan.

28.     Based at least on the Parties' negotiations of Giesler's Employment Agreement, and taking his allegations at face value, Giesler knew that SandRidge did not share Giesler's interpretation of the Long-Term Incentive Award, and instead maintained an interpretation to the contrary—*i.e.*, that additional RSUs would *not* vest upon a voluntary resignation.

29.     Because at the time the Parties executed the Employment Agreement, Giesler's purported interpretation of the Long-Term Incentive Award differed from that of SandRidge, there was no meeting of the minds between the Parties with respect to the meaning of that provision, a material term of the Employment Agreement.

30.     Despite a duty to do so, Giesler failed to disclose, on numerous occasions, the material information of his purported interpretation of the Long-Term Incentive Award to SandRidge's Board—that he was entitled to additional RSUs in the event of a voluntary termination—despite his knowledge of SandRidge's contrary interpretation.  This failure

to disclose material information in the face of a partial disclosure amounted to a material misrepresentation.

31.     Indeed, Giesler made partial and incomplete disclosures to SandRidge's Board and shareholders regarding his interpretation of the Long-Term Incentive Award, including, but not limited to: (i) during negotiations regarding his Employment Agreement and the execution thereof; (ii) during the drafting of SandRidge's 2021 Definitive Proxy Statement and related discussions with SandRidge's Board of Directors; and (iii) during SandRidge's Say-On-Pay process during the 2021 Proxy season.  In addition, as described above, Giesler also failed to file an SEC Form 4 disclosing his interpretation, despite his duty to do so.

32.     SandRidge relied on Giesler's concealment and omission of the material fact of his interpretation, at least by not seeking to clarify the Long-Term Incentive Award provision in his Employment Agreement or SandRidge's Incentive Plan.

33.     The lack of a meeting of the minds requires reformation of the Employment Agreement to void and disregard the entire Long-Term Incentive Award provision. Moreover, Giesler's inequitable conduct, including by withholding material information, and, upon information and belief, Giesler's knowledge thereof, further provides a basis for reformation.

34.     The initial RSU grant and vesting schedule are material and inextricable parts of the Long-Term Incentive Award provision in the Employment Agreement.  Giesler and SandRidge both considered the Long-Term Incentive Award to be a material aspect of Giesler's Employment Agreement based on the Parties' discussions during the negotiation

and execution of the Employment Agreement, and because the vesting of shares constitutes the lion's share of Giesler's potential compensation.

35.     Accordingly, the Court should declare that Giesler is not entitled to any of the SandRidge RSUs obtained pursuant to the Long-Term Incentive Award, whether vested or unvested, and any previously vested shares or RSUs should be returned to SandRidge.

36.     Further, Giesler's attempt to reap an additional nearly $1.5 million for fifteen months of work—an amount for which he has already been compensated by Southwestern—is not only baseless, illogical, and a plain double-recovery, but has resulted in unnecessary litigation costs for SandRidge in defending against Giesler's claim.

37.     Accordingly, in the alternative, even if Giesler did not harbor his purported interpretation of the Long-Term Incentive Award at the time of executing the Employment Agreement, because his interpretation is commercially unreasonable and not a valid interpretation of said provision, and because payment would result in double-recovery, the Court should declare that Giesler is not entitled to any additional RSUs.

## **PRAYER**

For the foregoing reasons, SandRidge requests that the Court enter judgment in its favor and against Giesler.  SandRidge requests that the Court:

(i)     Declare that the Employment Agreement should be reformed to strike the unenforceable "Long-Term Incentive Award" provision, and require Giesler to return to SandRidge any SandRidge RSUs obtained pursuant to that provision;

(ii)    Declare that Giesler is not entitled to any further or additional SandRidge RSUs;

(iii)   Award SandRidge all of its actual, direct, indirect, incidental, and consequential damages;

(iv)   Award SandRidge its reasonable attorneys' fees, expenses, court costs and fees, and all other reasonable costs and fees to which it is entitled; and

(v)   Award any and all further relief to which SandRidge may be entitled.


Respectfully submitted,

**SANDRIDGE ENERGY, INC.**

Date:  November 24, 2021                    */s/ L. Vance Brown*
                                             (Signed by Filing Attorney with permission of Attorney)
                                             L. Vance Brown
                                             **ELIAS, BOOKS, BROWN & NEWLSON, P.C.**
                                             Two Leadership Square
                                             211 North Robinson, Suite 1300
                                             Oklahoma City, OK 73102-7149
                                             Phone: (405) 232-3722
                                             Fax: (405) 232-3746
                                             Email: vbrown@eliasbooks.com


                                             */s/ Seth E. Spitzer*
                                             Chad B. Walker (admitted *pro hac vice*)
                                             John T. Sullivan (admitted *pro hac vice*)
                                             **WINSTON & STRAWN LLP**
                                             2121 N. Pearl Street, Suite 900
                                             Dallas, TX 75201
                                             Telephone: (214) 453-6500
                                             Facsimile: (214) 453-6400
                                             Email: cbwalker@winston.com
                                             Email: jsullivan@winston.com


                                             Seth E. Spitzer (admitted *pro hac vice*)
                                             Adam P. Moskowitz (admitted *pro hac vice*)
                                             **WINSTON & STRAWN LLP**
                                             200 Park Avenue
                                             New York, NY 10166

Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700
Email:  sspitzer@winston.com
Email:  apmoskowitz@winston.com

*Counsel for Defendant SandRidge Energy, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 24th day of November 2021, I electronically filed and served this document through the electronic filing system with notice to the following parties:

Phillip G Whaley
**RYAN WHALEY COLDIRON JANTZEN PETERS & WEBBER PLLC**
400 N. Walnut Ave.
Oklahoma City, OK 73104
Phone: 405-239-6040
Fax: 405-239-6766
Email: pwhaley@ryanwhaley.com

Jean C. Frizzell
Brandon T Allen
**REYNOLDS FRIZZELL LLP**
1100 Louisiana St.
Suite 3500
Houston, TX 77002
Phone: 713-485-7200
Fax: 713-485-7250
Email: jfrizzell@reynoldsfrizzell.com
Email: ballen@reynoldsfrizzell.com

The document electronically filed and served is available for viewing and/or downloading from the Western District of Oklahoma's Electronic Filing System.


*/s/ Seth E. Spitzer*
Seth E. Spitzer