**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

CARL GIESLER, JR.                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )          Case No. 21-CV-00904-HE
                                     )
SANDRIDGE ENERGY, INC.               )
                                     )
            Defendant.               )

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND BRIEF IN SUPPORT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 2

STATEMENT OF UNDISPUTED FACTS ..................................................................... 6

    A. SandRidge and Giesler Executed the Employment Contract, Which Provides That It Reflects Their Entire Agreement and That Oklahoma Law Governs. ................. 6

    B. Paragraph 5 of the Employment Contract Provides for an Initial Award of 1 Million Restricted Stock Units And Formulaically Provides a Vesting of a Portion of Those Units if Giesler's "Employment Is Terminated . . . for Any Reason Other Than Cause" Before His Third Employment Anniversary. ..................................... 6

    C. Giesler's Employment Terminated Effective July 16, 2021 Upon Giesler's Voluntary Resignation, But SandRidge Refused to Settle in Shares of SandRidge Common Stock and Transfer to Giesler the RSUs as Agreed Upon in the Employment Contract ........................................................................................ 9

STANDARD OF REVIEW ...................................................................................... 11

ARGUMENT ....................................................................................................... 12

I.    Oklahoma Law Requires Faithful Application of a Contract's Clear Terms ......... 12

II.    Upon the Voluntary Termination of Giesler's Employment, the Employment Contract Required SandRidge to Settle in Shares and Transfer to Giesler a Portion of the RSUs and Required Giesler to Forfeit a Portion of the RSUs ................................ 15

    A. The Plain Meaning of the Phrase "Employment Is Terminated" Encompasses Voluntary Termination Initiated by Giesler. .......................................................... 16

    B. Contrary to SandRidge's Interpretation, Interpreting "Employment Is Terminated" to Encompass Voluntary Termination Comports with the Remainder of the Parties' Written Agreement. ................................................................................ 18

    C. Contrary to SandRidge's Assertion, Its Compensation Committee May Not Retroactively Rewrite the Clear Terms of Paragraph 5 to Benefit SandRidge. ...... 21

III.    SandRidge Breached Paragraph 5 of the Employment Contract by Failing to Settle and Transfer the RSUs at Issue. ........................................................................... 25

IV.    As a Matter of Law, Giesler Is Owed 284,323 Restricted Stock Units, Settled in Shares of SandRidge Common Stock. ................................................................. 25

CONCLUSION ............................................................................................................. 26

## TABLE OF AUTHORITIES

**<u>CASES</u>**                                                                                     **<u>PAGE(S)</u>**

*B.A.P., L.L.P. v. Pearman*,
    250 P.3d 332 (Okla. Civ. App. 2011)……………………………………………20

*Bank of Oklahoma, N.A. v. Red Arrow Marina Sales & Serv., Inc.*,
    224 P.3d 685, 699 (Okla. 2009)………………………………………......…12-14

*Beattie v. State ex rel. Grand River Dam Auth.*,
    41 P.3d 377 (Okla. 2002)………………………………………………......…13

*Berry & Berry Acquisitions, LLC v. BFN Properties LLC*,
    416 P.3d 1061 (Okla. 2018)……………………………………...………13-14

*Cisneros v. Alpine Ridge Group*,
    508 U.S. 10 (1993)……………………………………………………......…23

*Currey v. Willard Steam Service, Inc.*,
    321 P.2d 680 (Okla. 1958)……………………………………………….…12

*Gibson v. Parish*,
    360 F. Appx. 974 (10th Cir. Jan. 13, 2010)……………………………………23

*Logan Cty. Conservation Dist. v. Pleasant Oaks Homeowners Ass'n*,
    374 P.3d 755 (Okla. 2016)………………………………………………..13

*Lucas v. Bishop*,
    956 P.2d 871 (Okla. 1998)…………………………………………......……16-17

*McGinnity v. Kirk*,
    362 P.3d 186 (Okla. 2015)………………………………………………..18

*Mercury Inv. Co. v. F.W. Woolworth Co.*,
    706 P.2d 523 (Okla. 1985)…………………………………….…………14

*M.J. Lee Const. Co. v. Oklahoma Transp. Auth.*,
    125 P.3d 1205 (Okla. 2005)………………………………………………13

*Morgan v. State Farm Mut. Auto. Ins. Co.*,
    488 P.3d 743 (Okla. 2021)………………………………………………11

iv

*Osprey L.L.C. v. Kelly–Moore Paint Co., Inc.*,
  984 P.2d 194 (Okla. 1999)……………………………………………...…13

*Pitco Prod. Co. v. Chaparral Energy, Inc.*,
  63 P.3d 541 (Okla. 2003)……………………………………….……….13-14

*Price v. State ex rel. State Emps. Grp. Health, Dental & Life Ins. Bd.*,
  757 P.2d 839 (Okla. 1988)……………………………………….....…17-18

*Red Rock Distrib. Co. v. State ex rel. Reneau*,
  993 P.2d 142 (Okla. Civ. App. 1999)…………………………….....…17-18

*Sullivan v. Gray*,
  78 P.2d 688 (Okla. 1938)………………………………………....……..20

*Urology Ctr. of S. Oklahoma v. Miller*,
  246 P.3d 736 (Okla. Civ. App. 2010)…………………………………….18

*Walker v. Builddirect.Com Techs. Inc.*,
  349 P.3d 549 (Okla. 2015)……………………………………….……..12

*Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*,
  No. CIV-08-1125-C, 2010 WL 11443362 (W.D. Okla.
  Dec. 10, 2010)……………………………………………………..…5, 11

*W. Steel Erection Co. v. Gatlin*,
  319 P.2d 607, 610 (Okla. 1957)..…………………………….………17-18

## STATUTES AND OTHER AUTHORITIES                PAGE(S)

FED. R. CIV. P. 56(A) **…………………………………………………...**1, 5, 11

FED. R. CIV. P. 8(C)……………………………………...………………………5

LCVR 56.1**……………………………………………………..………...**1

15 OKLA. STAT. ANN. § 154……………………………………………..12

15 OKLA. STAT. ANN. § 155……………………………………………..12

15 OKLA. STAT. ANN. § 157……………………………...……………18-20

BLACK'S LAW DICTIONARY (11TH ED. 2019)**…**……………………….……….16-17

Plaintiff Carl Giesler, Jr. ("Giesler") files this motion for partial summary judgment (the "Motion") pursuant to Fed. R. Civ. P. 56(a).  *See* LCvR 56.1.  Giesler has asserted a claim against Defendant SandRidge Energy, Inc. ("SandRidge") for breach of the written employment contract to which he and SandRidge are parties (the "Employment Contract").[1]

Based on the clear language in the Employment Contract, Giesler seeks summary judgment on the following points: (1) upon Giesler's undisputed voluntary resignation from SandRidge effective July 16, 2021, a formula-established portion of previously unvested Restricted Stock Units should have vested, settled in shares of SandRidge common stock, and been transferred to Giesler by SandRidge; (2) SandRidge's undisputed failure to transfer the stock breached the Employment Contract; and (3) the Employment Contract's formula yields an entitlement by Giesler to 284,323 Restricted Stock Units, settled in SandRidge common stock.

In the end, as detailed below, this Motion turns on a simple, unambiguous proposition that is clear from the four corners of the Employment Contract and mandated by Oklahoma contract interpretation principles: The contract phrase "employment is terminated" means "employment is terminated," as Giesler contends.  It does not mean "if employer terminates employee," as SandRidge contends.

---

[1] *See* Exhibit 1 (Declaration of Carl Giesler, Jr. ["Giesler Declaration"]); Exhibit 2 (Employment Contract).

## <u>INTRODUCTION</u>

This is an employment contract interpretation case involving an unambiguous contract. The parties negotiated the Employment Contract, by which Giesler became SandRidge's Chief Executive Officer in exchange for the terms stated in the Employment Contract. The parties reduced their bargain to writing in the Employment Contract, which includes a merger clause confirming that the Employment Contract "describes the terms and conditions of [Giesler's] employment and supersedes and preempts in all respects any prior understandings, agreements or representations by or between the parties, written or oral, which may have related in any manner to the subject matter hereof." Both parties to the Employment Contract are sophisticated.[2]

Paragraph 5 of the Employment Contract sets forth the result of the parties' bargain concerning a stock-based incentive system, in the form of Restricted Stock Units ("RSUs"), which were to be "settled in shares of [SandRidge's] common stock upon vesting." The Employment Contract sets up four pertinent scenarios: (a) in the event Giesler remained at SandRidge for three years (*i.e.*, from April 6, 2020 through April 5, 2023), he would receive the full grant of 1 million RSUs; (b) in the event Giesler's "employment is terminated" for any reason within the initial ten weeks of employment (*i.e.*, from April 6, 2020 through June 14, 2020), he would receive none of the 1 million RSUs; (c) in the event Giesler's

---

[2] SandRidge is a publicly-traded oil and gas company with almost $100 million in cash and a quarterly net income of roughly $29 million. *See* Press Release, SandRidge Energy, "SandRidge Energy, Inc. Announces Financial and Operating Results for the Three and Ninth Month Periods Ended September 31, 2021" (Nov. 9, 2021), http://s21.q4cdn.com/174552385/files/doc_news/2021/11/09/SD-3Q21-Earnings-Release_2021-1109-v2.pdf.

"employment is terminated" *for any reason other than cause* after the ten-week anniversary of his hiring but before the third anniversary of his hiring (*i.e.*, from June 15, 2020 through April 5, 2023), he would receive only a portion of the 1 million RSUs, as established under an agreed-upon, time-dependent formula (the "Formula"), foregoing the remainder of the RSUs; and (d) in the event Giesler's "employment is terminated" *for cause* after the ten-week anniversary of his hiring but before the third anniversary of his hiring (*i.e.*, from June 15, 2020 through April 5, 2023), he would receive none of the 1 million RSUs and would have to forfeit any RSUs previously vested, settled in shares and transferred to him.

Giesler's employment with SandRidge terminated effective July 16, 2021 via voluntary termination unrelated to cause (*i.e.*, under scenario (c) above).  Accordingly, per the parties' bargain, as clearly expressed in the Employment Contract and its Formula, Giesler became entitled to the formulaically defined settlement and transfer of a portion of the 1 million RSUs and gave up any potential to earn the remainder of the RSUs.  Giesler made demand upon SandRidge for compliance with the Employment Contract.  SandRidge refused to honor the deal it struck as part of Giesler's hiring.

Giesler asserts that the phrase "employment is terminated" means what it plainly says.  That is, it applied when Giesler's employment (*i.e.*, "employment") at SandRidge ended (*i.e.*, "is terminated"), without regard to whether the termination was initiated by Giesler, SandRidge, or any other circumstance (*e.g.*, death or disability).  The triggering event was that his "employment is terminated."  Consistent with controlling Oklahoma law:

- Giesler's interpretation comes directly from the contract language at issue, without adding additional words that the parties could have but chose not to add at the time of contract formation;

- Giesler's interpretation is based directly on the contract's plain language ("employment is terminated" means "employment is terminated");

- Giesler's interpretation is consistent with the undisputed fact that, elsewhere in the contract, the parties demonstrated their (otherwise obvious) ability to use words when they intended to make an employee-initiated or employer-initiated distinction; and

- Giesler's interpretation remains internally consistent throughout the contract (*i.e.*, Giesler does not interpret the words to mean one thing in one contract clause but another thing in another contract clause).

SandRidge's interpretation, on the other hand, is none of these things.  Instead:

- SandRidge's interpretation necessarily adds words that do not exist in the key contract phrase at issue, claiming that "employment is terminated" includes only an "***involuntary*** termination of employment ***by SandRidge***," but not a voluntary termination such as a resignation;

- SandRidge's interpretation is not based on the plain meaning of the words "employment is terminated" (*i.e.*, SandRidge claims "employment is terminated" really means "SandRidge terminates Giesler");

- SandRidge's interpretation is inconsistent with the undisputed fact that, elsewhere in the contract, the parties demonstrated their (otherwise obvious) ability to use words to provide for an employee-initiated or employer-initiated distinction; and

- SandRidge's interpretation is internally inconsistent, requiring those words to mean one thing in one contract clause but another thing in another contract clause.

For these reasons, as described below, Giesler seeks a summary judgment on the key issue of contract interpretation.

The remainder of the relief Giesler seeks in this Motion naturally follows from a few additional undisputed facts. First, the Formula calculates the portion of the RSUs at issue based on the undisputed date of the termination of Giesler's employment, July 16, 2021. Giesler therefore seeks a summary judgment on that calculation. Second, SandRidge undisputedly did not transfer to Giesler the stock at issue, thereby breaching the Employment Contract. Giesler therefore seeks a summary judgment on that issue. These appropriate determinations would reduce the case to three remaining issues: SandRidge's affirmative defenses; other actual, indirect and consequential damages to Giesler; and Giesler's request for attorneys' fees.[3]

---

[3] SandRidge has indiscriminately asserted 19-plus affirmative defenses, including but not limited to "each of the defenses listed in Federal Rule of Civil Procedure 8(c)(1)." SandRidge Answer and Counterclaims, Nov. 24, 2021, ECF No. 25, at 8-11. Giesler believes that all are unsupported as a matter of law and that many are patently frivolous. As a few of many such examples: SandRidge pleads affirmative defenses such as "arbitration and award," even though there undisputedly has been no arbitration or award; "injury by a fellow servant," even though such a defense has no place in a contract dispute; "res judicata," even though there is no prior suit, much less judgment; and "statute of limitations," even though Giesler filed suit within weeks of his departure from SandRidge. *See id.* at 8 (incorporating defenses listed at Fed. R. Civ. P. 8(c)(1)). Nonetheless, so that the Court may focus on the contract interpretation issue central to the dispute, the Motion leaves for another day the handling of SandRidge's affirmative defenses. *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. CIV-08-1125-C, 2010 WL 11443362, at *21 (W.D. Okla. Dec. 10, 2010) (under Federal Rule 56, "a party may move for summary judgment on all or part of the claim.") (citing Fed. R. Civ. P. 56(a)).

## STATEMENT OF UNDISPUTED FACTS

**A. SandRidge and Giesler Executed the Employment Contract, Which Provides That It Reflects Their Entire Agreement and That Oklahoma Law Governs.**

1. On or about April 6, 2020, Giesler and SandRidge executed the Employment Contract.[4]  The Employment Contract describes the terms and conditions of Giesler's employment as Chief Executive Officer of SandRidge, including his compensation for that role.[5]  The Employment Contract, in its final form, is attached to this Motion.[6]  The Employment Contract expressly provides that it "supersedes and preempts in all respects any prior understandings, agreements or representations by or between the parties, written or oral, which may have related in any manner to the subject matter hereof."[7]  The Employment Contract further provides that it is governed by Oklahoma law.[8]

**B. Paragraph 5 of the Employment Contract Provides for an Initial Award of 1 Million Restricted Stock Units And Formulaically Provides a Vesting of a Portion of Those Units if Giesler's "Employment Is Terminated . . . for Any Reason Other Than Cause" Before His Third Employment Anniversary**.

2. Paragraph 5 of the Employment Contract awarded Giesler 1 million RSUs, referred to as the "Initial RSU Grant," upon signing.[9]  The parties decided in the Employment Contract what portion of this Initial RSU Grant Giesler would earn, if any, based in part

---

[4] Exhibit 1 (Giesler Declaration) ¶ 3.

[5] *See* Exhibit 2 (Employment Contract).

[6] *See* Exhibit 1 (Giesler Declaration) ¶ 3; Exhibit 2 (Employment Contract).

[7] Exhibit 2 (Employment Contract) ¶ 1.

[8] *Id.* ¶ 10.

[9] *Id.* ¶ 5.

on how long he was employed at SandRidge.[10]  Giesler's Initial RSU Grant would settle in

shares of SandRidge common stock and vest in three pre-determined one-year intervals.[11]

Specifically, Paragraph 5 provides:

> Effective as of the Effective Date [of the Employment
> Contract, April 6, 2020], you will receive an award of
> 1,000,000 Restricted Stock Units (the "Initial RSU Grant")
> under the 2016 Omnibus Incentive Plan (As Amended and
> Restated as of August 8, 2018) (the "Incentive Plan"). This
> Initial RSU Grant will be subject to the terms and conditions
> of the Incentive Plan, and will (i) be settled in shares of the
> Corporation's common stock upon vesting, and (ii) vest in
> three equal installments on each of the first, second, and third
> anniversaries of the Effective Date (the "Vesting Dates").[12]

Calculated from the Effective Date of April 6, 2020, the three annual Vesting Dates under

the Employment Contract are: April 6, 2021; April 6, 2022; and April 6, 2023.[13]

   3.  Paragraph 5 then provides that, if Giesler's "employment is terminated" before the

Compensation Date of June 15, 2020, Giesler would forfeit the entire Initial RSU Grant:

> Notwithstanding   the   preceding   sentence,   if   [Giesler]'s
> employment   is   terminated   for   any   reason   before   the
> Compensation Date, Executive shall forfeit all of the Initial
> RSU Grant.[14]

---

[10] *See id.*

[11] *Id.*

[12] *Id.*  The 2016 Omnibus Incentive Plan (As Amended and Restated as of August 8, 2018) ("Omnibus Incentive Plan") is attached to this Motion.  *See* Exhibit 3 (Omnibus Incentive Plan).

[13] *See* Exhibit 2 (Employment Contract) ¶ 5.

[14] *Id.*

4.   Next, Paragraph 5 specifies the procedure governing the Initial RSU Grant in the event "[Giesler]'s employment is terminated after the Compensation Date [June 15, 2020] but before the third Vesting Date [April 6, 2023]."[15]   If Giesler's "employment is terminated" during that period "for any reason other than Cause,"[16] Giesler would be entitled to a portion of the unvested Initial RSU Grant according to the Formula, but he would forego the remainder.[17]   The Formula takes into account the length of time Giesler served as CEO:

> [I]f Executive's employment is terminated after the Compensation Date but before the third Vesting Date, (x) for any reason other than Cause (as defined in the Incentive Plan), an additional portion of the unvested Initial RSU Grant shall be vested, equal to the product of the number of the Initial RSU Grant shares that are not vested as of Executive's employment termination, multiplied by a fraction, the numerator of which is the number of days between the Effective Date and the date of Executive's employment termination, and the denominator of which is 1095.[18]

5.   Thus, if Giesler's "employment is terminated" "for any reason other than Cause" during the period from June 15, 2020 through April 5, 2023, per the Formula, he would receive a time-driven portion of the unvested remainder of the Initial RSU Grant.[19]

---

[15] Exhibit 2 (Employment Contract) ¶ 5.

[16] If Giesler's "employment [was] terminated" during that period "for Cause" as defined in the Omnibus Incentive Plan, he would forfeit the entire Initial RSU Grant.  *Id.*

[17] Exhibit 2 (Employment Contract) ¶ 5.

[18] *Id.*

[19] *Id.*

Because the fraction against which the unvested remainder was multiplied would be closer to one the more days that passed between the Effective Date of April 6, 2020 and the termination date, the parties' agreed Formula would give Giesler a greater portion of his unvested stock the longer he remained at SandRidge and a smaller portion the more quickly he departed.[20]

6.   Finally, in the event Giesler stayed for the full three years, he would receive the entirety of the Initial RSU Grant.[21]

**C. Giesler's Employment Terminated Effective July 16, 2021 Upon Giesler's Voluntary Resignation, But SandRidge Refused to Settle in Shares of SandRidge Common Stock and Transfer to Giesler the RSUs as Agreed Upon in the Employment Contract.**

7.   Giesler voluntarily resigned from the employment of SandRidge on July 16, 2021, which falls between June 15, 2020 and April 6, 2023.[22]  Giesler's resignation was unrelated to cause.[23]   According to the Employment Contract, if Giesler's "employment is

---

[20] *See* Exhibit 2 (Employment Contract) ¶ 5.

[21] *Id*.  Under the Formula the parties agreed upon in the Employment Contract, three years (*i.e.*, 1095 days) was the longest period of time affecting the contractual RSU calculation attendant to the "Long-Term Incentive Award" of Paragraph 5.

[22] Exhibit 1 (Giesler Declaration) ¶ 5.

[23] *Id*.  It is undisputed that his termination was not for "Cause."  Given that it was a voluntary termination, that is self-evident.  Also, SandRidge publicly acknowledged at the time of Giesler's departure that he "resigned . . . in order to pursue another career opportunity" and that his "resignation . . . [was] not the result of any disagreement with the Company or any matter relating to the Company's operations, policies or practices."  *See* Press Release, SandRidge Energy, "SandRidge Energy, Inc. Announces Resignation of Carl Giesler and Appointment of Grayson Pranin to President and Chief Executive Officer" (July 13, 2021),   http://s21.q4cdn.com/174552385/files/doc_news/2021/07/PR-CEO-Resignation-Sandridge-Energy-Inc.v5-(Clean)_website.pdf.

terminated" "for any reason other than Cause" after the Compensation Date of June 15, 2020 and before the third Vesting Date of April 6, 2023, he became entitled to a portion of the unvested Initial RSU Grant according to the Formula set forth at Paragraph 5: "the product of the number of the Initial RSU Grant shares that are not vested as of [Giesler's] employment termination, multiplied by a fraction, the numerator of which is the number of days between the Effective Date [of the Employment Contract, April 6, 2020] and the date of [Giesler's] employment termination [July 16, 2021], and the denominator of which is 1095."[24]

8. Here, "the number of the Initial RSU Grant shares that are not vested as of [Giesler's] employment termination" was 666,666.66 (two thirds of the 1,000,000 total Initial RSU Grant) because Giesler had not otherwise forfeited the Initial RSU Grant by the first Vesting Date, at which point one-third of the Initial RSU Grant vested.[25] The number of days between the Effective Date of April 6, 2020 and termination of Giesler's employment on July 16, 2021 was 467 days.[26] Thus, applying the parties' Formula in the Employment Contract, Giesler was entitled to receive upon termination of his employment 284,323 RSUs (*i.e.*, 666,666.66 unvested RSUs x (467 days of employment/1095 days in three years)).[27]

---

[24] Exhibit 2 (Employment Contract) ¶ 5.  Three years equates to 1095 days.

[25] *See id*.

[26] *See id.*; Exhibit 1 (Giesler Declaration) ¶ 5.

[27] *See* Exhibit 2 (Employment Contract) ¶ 5.

9. Giesler asked for SandRidge to settle the RSUs in SandRidge stock and transfer them to him.[28] SandRidge refused.[29] On September 15, 2021, Giesler filed the Complaint in this action alleging one cause of action against SandRidge for breach of contract and seeking the 284,323 RSUs that he is owed under Paragraph 5 of the Employment Contract, in addition to attorneys' fees and other relief.[30]

## STANDARD OF REVIEW

Summary judgment is appropriate on a claim or defense, or part of a claim or defense, where there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Consistent with the text of Rule 56(a), under Federal Rule 56, "a party may move for summary judgment on all ***or part of*** the claim."  *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. CIV-08-1125-C, 2010 WL 11443362, at *21 (W.D. Okla. Dec. 10, 2010) (emphasis added).  Giesler has asserted a claim for breach of contract, the elements of which are: (1) formation of a contract; (2) breach of the contract; and (3) direct damages as a result of the breach.  *Morgan v. State Farm Mut. Auto. Ins. Co.*, 488 P.3d 743, 748 (Okla. 2021).  While Giesler leaves for another day SandRidge's myriad affirmative defenses, the contract interpretation, the existence of a breach, and the direct damages are appropriate for summary adjudication on the Motion.

---

[28] Exhibit 1 (Giesler Declaration) ¶ 6.

[29] *Id.* ¶ 7.

[30] *See* Complaint, Sept. 15, 2021, ECF No. 1.

11

## **ARGUMENT**

The primary issue in this case is a straightforward contract interpretation question involving the meaning of Paragraph 5 of the Employment Contract and, in particular, the words "employment is terminated." There can be no genuine dispute of material fact because Paragraph 5 is set forth in clear terms that govern the parties' rights as a matter of law. Applying these unambiguous terms, there is likewise no genuine dispute of material fact that the contract was breached, or concerning the amount of direct damages in the form of RSUs. These legal issues turn on the four corners of the written agreement, and their resolution will significantly streamline this litigation.

### I.    **Oklahoma Law Requires Faithful Application of a Contract's Clear Terms.**

It is axiomatic under Oklahoma law that "the paramount objective of contract interpretation is to effectuate the intent of the parties ***as expressed by the terms of the contract***." *Walker v. Builddirect.Com Techs. Inc.*, 349 P.3d 549, 552 (Okla. 2015) (citing *Currey v. Willard Steam Service, Inc.*, 321 P.2d 680, 685 (Okla. 1958)) (emphasis added). Oklahoma's contract interpretation statute mandates repeatedly that, where contractual terms are clear, those terms alone govern the rights of parties to an agreement. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity" (15 OKLA. STAT. ANN. § 154) and, subject to the other canons of construction codified by Oklahoma law, "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." 15 OKLA. STAT. ANN. § 155; *see also Walker*, 349 P.3d at 554 ("This Court ascertains the parties' mutual intentions from the four corners of the contract."); *Bank of Oklahoma, N.A.*

*v. Red Arrow Marina Sales & Serv., Inc.*, 224 P.3d 685, 699 (Okla. 2009) ("Where a contract is complete in itself and, as viewed in its entirety, contains clear and explicit language leaving it free of ambiguity, its language is the only legitimate evidence of what the parties intended.").

Unless "the contractual document is unclear or inconsistent," consideration of extrinsic evidence to determine intent is inappropriate. *Logan Cty. Conservation Dist. v. Pleasant Oaks Homeowners Ass'n*, 374 P.3d 755, 762 (Okla. 2016) (citing *Beattie v. State ex rel. Grand River Dam Auth.*, 41 P.3d 377, 382 (Okla. 2002)); *see also Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 546 (Okla. 2003) (to determine whether a contact is ambiguous, thus requiring utilization of extrinsic evidence, courts look to the "language of the entire agreement"). Moreover, "[t]he mere fact that the parties press for different interpretations . . . does not make the [contractual language] ambiguous," *M.J. Lee Const. Co. v. Oklahoma Transp. Auth.*, 125 P.3d 1205, 1210 (Okla. 2005), and "courts should refrain from creating an ambiguity by 'using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on [a] provision.'" *Logan Cty. Conservation Dist.*, 374 P.3d at 762 (quoting *Osprey L.L.C. v. Kelly–Moore Paint Co., Inc.*, 984 P.2d 194, 199 (Okla. 1999)).

Faithful application of clear contractual terms creates predictability for parties and honors the bargain struck, which is particularly important as to sophisticated parties that have power to freely negotiate, such as those here. "Parties initiate contracts to provide a degree of certainty in their business transactions." *Berry & Berry Acquisitions, LLC v. BFN Properties LLC*, 416 P.3d 1061, 1068 (Okla. 2018) (citation omitted). Therefore,

Oklahoma law respects the freedom of parties "to bargain for, or away, contractual provisions" and mandates that it is not the province of courts "to remake contracts to suit the changing whims of contracting parties."   *Id.* (citation omitted); *see also Bank of Oklahoma, N.A.*, 224 P.3d at 700 ("Faced with the clear terms of the guaranty at issue, we cannot give a defendant the benefit of some other contract he in hindsight might wish he had made.  We can only interpret the plain language of the contract now before us."); *Mercury Inv. Co. v. F.W. Woolworth Co.*, 706 P.2d 523, 532 (Okla. 1985) ("The lease is cast in the form of a highly sophisticated document employing clear, precise and unambiguous language that covers a myriad of details regarding the parties' relationship as landlord vis-a-vis tenant . . . To now imply the covenant pressed for by Mercury would be to rewrite the parties' agreement.  We should be loath to hold Woolworth to any greater level of business productivity than Mercury itself was able to exact from a willing tenant.").

Both the meaning of clear contractual terms and the question of whether the contractual terms are clear (thus ending the analysis) or ambiguous (permitting consideration of extrinsic evidence) are questions of law for the court. *Pitco Prod. Co.*, 63 P.3d at 545.  As discussed below, the contract interpretation question presented by this Motion is governed by unambiguous contractual terms.  Thus, it presents a discrete legal question that is well-suited to summary adjudication.

II.   **Upon the Voluntary Termination of Giesler's Employment, the Employment Contract Required SandRidge to Settle in Shares and Transfer to Giesler a Portion of the RSUs and Required Giesler to Forfeit a Portion of the RSUs.**

The language of the Employment Contract concerning SandRidge's obligation to pay Giesler a portion of unvested RSUs upon his departure is clear as a matter of law and thus must be enforced.  Paragraph 5 provides that,

> if [Giesler's] employment is terminated after the Compensation Date but before the third Vesting Date, [] for any reason other than Cause (as defined in the Incentive Plan), an additional portion of the unvested Initial RSU Grant shall be vested, equal to the [result of the Formula].[31]

There is no dispute here that Giesler departed the Company during the timeframe specified by this passage and that he departed for reasons "other than Cause."  The only dispute concerning this provision is whether Giesler's "employment [was] terminated" (triggering the reduced RSU payment obligation according to the Formula) because he, rather than SandRidge, initiated that termination.   SandRidge asserted in its Answer and Counterclaims that the phrase "employment is terminated" was intended to refer—not to the general termination of employment, as the plain terms would suggest—but more narrowly to a type of termination of employment, specifically, the ***involuntary*** termination of employment ***by SandRidge***.[32]   This overly narrow interpretation would do precisely what Oklahoma's contract law principles forbid by effectively writing into the contract terms to which the parties did not agree, as expressed within the four-corners of the

---

[31] Exhibit 2 (Employment Contract) ¶ 5.

[32] SandRidge Answer and Counterclaims, Nov. 24, 2021, ECF No. 25, at 12.

Employment Contract.  SandRidge cannot, after Giesler has entered into the Employment Contract and provided services under it, be permitted to force this strained, ex post facto, and self-serving interpretation onto clear contractual language.

The only possible correct interpretation of the phrase "employment is terminated" in Paragraph 5—which makes no reference to the terminating party—is the one that honors the plain language of that phrase.  The termination of employment referenced in Paragraph 5 means, simply, the end or conclusion of employment, regardless of whether the employment is terminated voluntarily by Giesler or involuntarily by SandRidge or by some other means (*e.g.*, death or disability).  Not only does this interpretation apply the plain meaning of the terms but—critically—it also harmonizes the entirety of the parties' written agreement in two ways.  Applying the plain text interpretation urged by Giesler causes Paragraph 5, read as a whole, to set forth a comprehensible scheme incentivizing retention—which SandRidge concedes is the aim of the provision.  Further, this interpretation comports with the use of the term "termination" elsewhere in the parties' agreement.

**A. The Plain Meaning of the Phrase "Employment Is Terminated" Encompasses Voluntary Termination Initiated by Giesler.**

Oklahoma law requires that courts interpreting a contract apply the plain meaning of its terms, absent some special meaning conveyed by the contract.  *See* 15 OKLA. STAT. ANN. § 160 ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the

16

latter must be followed."); *Lucas v. Bishop*, 956 P.2d 871, 874 (Okla. 1998) (contractual terms "must be given [their] plain ordinary meaning") (citation omitted).  The plain and ordinary meaning of "terminate" is "[t]o put an end to; to bring to an end" or "[t]o end; to conclude" (Terminate, BLACK'S LAW DICTIONARY (11th ed. 2019)), and *Black's Law Dictionary* has defined "termination of employment" as "[t]he complete severance of an employer-employee relationship."  Termination, BLACK'S LAW DICTIONARY (11th ed. 2019).[33]

Plainly put, "employment is terminated" when it is ended or concluded, regardless of by whom or what.  None of these definitions indicates that the meaning of the phrase depends on whether the employment was voluntarily "terminated" by Giesler or involuntarily "terminated" by SandRidge or circumstances (*e.g.*, death or disability).  Nor does the Employment Contract specify that the term is limited in that manner, such as by referring to Giesler's employment as being either "involuntarily terminated" or "terminated **by SandRidge**," as the parties easily could have done if that was their intent.  Giesler's "employment" was "terminated" when he resigned from SandRidge, just as it would have been had SandRidge fired him.

That plain-text reading comports with how Oklahoma courts have interpreted the terms "terminate" or "termination" of employment.  *See, e.g.*, *Price v. State ex rel. State*

---

[33] Resources specifically intended for employers and employees agree.  *See also What does Terminated mean?*, Indeed.com, https://www.indeed.com/hire/c/info/what-does-terminated-mean ("Termination of employment occurs when an employer or an employee ends the work relationship.  Termination can be voluntary or initiated by the employee, or involuntary, in which case, the employer has decided to terminate employment.").

*Emps. Grp. Health, Dental & Life Ins. Bd*, 757 P.2d 839, 841 (Okla. 1988) (discussing an employee's voluntary "termination" of her employment); *W. Steel Erection Co. v. Gatlin*, 319 P.2d 607, 610 (Okla. 1957) (discussing termination as something that can be effectuated unilaterally by the employee or the employer, or "bilateral[ly]" by both in a mutual decision); *Red Rock Distrib. Co. v. State ex rel. Reneau*, 993 P.2d 142, 143 (Okla. Civ. App. 1999) (affirming an Oklahoma Department of Labor determination "that an employee was entitled to certain fringe benefits after she voluntarily terminated her employment"); *Urology Ctr. of S. Oklahoma v. Miller*, 246 P.3d 736, 737 (Okla. Civ. App. 2010) (affirming award of benefits to an employee who "voluntarily terminate[d] her employment").

**B. Contrary to SandRidge's Interpretation, Interpreting "Employment Is Terminated" to Encompass Voluntary Termination Comports with the Remainder of the Parties' Written Agreement.**

In addition to its plain meaning, interpreting the phrase "employment is terminated" to include both voluntary and involuntary termination harmonizes the provision at issue with the remainder of the parties' written agreement, causing Paragraph 5 to set forth a comprehensible scheme that best furthers the goal of retention (the conceded purpose of the Employment Contract) and ensuring consistent use of terms. "A contract is to be construed as a whole, giving effect to each of its parts, and not construed so as to make a provision meaningless, superfluous or of no effect." *McGinnity v. Kirk*, 362 P.3d 186, 199 (Okla. 2015); *see also* 15 OKLA. STAT. ANN. § 157 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others.").

The phrase "employment is terminated" must be interpreted to encompass both termination of Giesler's employment by Giesler and termination of his employment by SandRidge for two important, additional reasons:

First, the Employment Contract demonstrates that, when they so intended, the parties clearly knew how to draw and did draw a distinction between "involuntary termination" and "voluntary termination." For instance, Article 6 of the Omnibus Incentive Plan, which the Employment Contract generally incorporates by reference,[34] addresses the treatment of stock options in various scenarios and distinguishes—in plain words— between "voluntary" and "involuntary" terminations.[35] Paragraph 6.4(g) addresses the treatment of stock options "if a Participant's Termination is by involuntary termination by the Company without Cause." Likewise, Paragraph 6.4 of the Omnibus Incentive Plan refers in multiple places to a "voluntary" termination, conveying unequivocally that the word "termination" can include the scenario where an employee elects to resign.[36] SandRidge knows how to convey with clarity that it intends to reference only an involuntary or voluntary termination. It did not do so in the Employment Contract. Unlike Giesler's interpretation, SandRidge's interpretation thus requires the parties to have

---

[34] While it is appropriate to look to the entirety of the parties' written agreement, including the Omnibus Incentive Plan, to determine the parties' intent in using certain terminology, the Employment Contract also makes clear that the Omnibus Incentive Plan cannot override clear terms contained in Paragraph 5 concerning treatment of the Initial RSU Grant in the event of a termination of employment. *See* Section II(c).

[35] *See* Exhibit 3 (Omnibus Incentive Plan) ¶ 6.4.

[36] *See* Exhibit 3 (Omnibus Incentive Plan) ¶ 6.4(h) ("if a Participant's Termination is voluntary . . ."); *id.* ¶ 6.4(i) ("if a Participant's Termination . . . is a voluntary Termination").

forgotten how to do so in the particular phrase at issue.  *See* 15 OKLA. STAT. ANN. § 157 (requiring that the "whole of a contract is to be taken together," with "each clause helping to interpret the others."); *B.A.P., L.L.P. v. Pearman*, 250 P.3d 332, 337 (Okla. Civ. App. 2011) (in interpreting the term "parties" in a contract, declining to "substitute" the term "partners" for "parties" where the contract used the former in other provisions and thus "[t]he drafters of the Agreement were in a better position to [make that substitution] than th[e] Court").

Second, unlike Giesler's interpretation, to remain consistent with the purpose SandRidge itself posits, SandRidge's interpretation of the same words "employment is terminated" must necessarily change within Paragraph 5 itself.  This is a tell-tale sign of an impermissible interpretation, under Oklahoma law.  *See B.A.P.*, 250 P.3d at 336–37 ("every provision must be construed so as to be consistent with each other") (quoting *Sullivan v. Gray*, 78 P.2d 688, 690 (Okla. 1938)).

SandRidge posits that Paragraph 5 is intended to incentivize retention of Giesler by discouraging voluntary resignation.[37]  But, unlike Giesler's interpretation, SandRidge's own interpretation of the phrase "employment is terminated" is directly at odds with its own stated purpose of Paragraph 5.  For example, Paragraph 5 states that "[e]ffective as of the Effective Date, [Giesler] will receive an award of 1,000,000 Restricted Stock Units (the 'Initial RSU Grant')," but that if Giesler's "employment is terminated for any reason before the Compensation Date [June 15, 2020], [Giesler] shall forfeit all of the Initial RSU

---

[37] SandRidge Answer and Counterclaims, Nov. 24, 2021, ECF No. 25, at 11-12.

Grant."[38]   Applying Giesler's plain-text definition of "employment is terminated"
explained above, if Giesler voluntarily terminates his employment before the
Compensation Date (*i.e.*, before June 15, 2020), he forfeits all of the Initial RSU Grant.
Under SandRidge's interpretation, however, if Giesler voluntarily terminates his
employment before the Compensation Date (*i.e.*, before June 15, 2020), Giesler forfeits
nothing (since SandRidge contends "employment is terminated" does not include a
voluntary termination).   In other words, under SandRidge's interpretation, Giesler would
be entitled to the full Initial RSU Grant by simply quitting on day one, since (according to
SandRidge) the forfeiture language would not have been triggered by a voluntary
resignation by Giesler.   It is SandRidge's interpretation that incentivizes an early departure,
not Giesler's.   Per the Formula, Giesler's interpretation incentivizes retention by providing
for fewer RSUs the earlier Giesler departs and more RSUs the later. SandRidge's
interpretation of the same words cannot be consistently maintained throughout Paragraph
5, much less the entirety of the Employment Contract, without leading to outcomes directly
in conflict with SandRidge's stated objective to incentivize retention.

## C. Contrary to SandRidge's Assertion, Its Compensation Committee May Not Retroactively Rewrite the Clear Terms of Paragraph 5 to Benefit SandRidge.

SandRidge asserted in its Answer and Counterclaim that its interpretation of
Paragraph 5 governs because—after Giesler's employment terminated, after Giesler
demanded compliance with the Employment Contract, and without Giesler's consent—
SandRidge's Compensation Committee retroactively adopted its own self-serving contract

---

[38] Exhibit 2 (Employment Contract) ¶ 5.

interpretation.[39]   Aside from being manifestly illogical, SandRidge's argument ignores common law and contractual prohibitions against SandRidge retroactively redefining the parties' bargain in this manner.

In its Answer and Counterclaim, SandRidge partially quoted language from Paragraph 5 of the Employment Contract stating that the "Initial RSU Grant will be subject to the terms and conditions of the Incentive Plan," and language from Paragraph 3.4 of the Omnibus Incentive Plan providing that decisions or interpretations by the Committee "arising out of or in connection with the Plan . . . shall be final, binding and conclusive on the Company and all employees and Participants."[40]   However, SandRidge fails to acknowledge three other key contractual terms that preclude SandRidge's attempt to retroactively alter the parties' bargain without Giesler's consent.

First, immediately after the language in Paragraph 5 of the Employment Contract "subject[ing]" the Initial RSU Grant to the terms of the Omnibus Incentive Plan, and before Paragraph 5 specifies treatment of the Initial RSU Grant in the event of termination of employment, Paragraph 5 includes the phrase, "*[n]otwithstanding the preceding sentence*."[41]   The referenced "preceding sentence" is the language upon which SandRidge

---

[39] SandRidge Answer and Counterclaims, Nov. 24, 2021, ECF No. 25, at 15.

[40] SandRidge Answer and Counterclaims, Nov. 24, 2021, ECF No. 25, at 15 (quoting Exhibit 2 [Employment Contract] ¶ 5 and Exhibit 3 [Omnibus Incentive Plan] ¶ 3.4).

[41] Exhibit 2 (Employment Contract) ¶ 5 ("This Initial RSU Grant will be subject to the terms and conditions of the Incentive Plan, and will (i) be settled in shares of the Corporation's common stock upon vesting, and (ii) vest in three equal installments on each

relies, "subject[ing]" the Initial RSU Grant to the terms of the Omnibus Incentive Plan.[42]

In other words, the Employment Contract makes clear that the Omnibus Incentive Plan does not override the terms in Paragraph 5 following the "notwithstanding" clause, including the terms concerning treatment of the Initial RSU Grant in the event Giesler's "employment is terminated for any reason other than Cause" after the ten-week anniversary of his hiring but before the third anniversary of his hiring. *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) ("the Courts of Appeals generally have interpreted similar 'notwithstanding' language . . . to supersede all other laws, stating that '[a] clearer statement is difficult to imagine'") (internal citations and quotations omitted); *Gibson v. Parish*, 360 F. Appx. 974, 980 (10th Cir. Jan. 13, 2010) (holding "notwithstanding" to mean "in spite of the fact that"). In other words, the parties expressly and categorically agreed that Giesler would be compensated per Paragraph 5 despite (*i.e.*, "notwithstanding") any other possible provision or right stated in the Omnibus Incentive Plan, including the provision upon which SandRidge now relies. SandRidge, yet again, ignores the plain language of Paragraph 5.

Second, on top of that and not surprisingly, the Omnibus Incentive Plan itself specifically provides that, "notwithstanding" the Compensation Committee's authority to interpret the Omnibus Incentive Plan, that authority cannot unilaterally impair a party's contract rights without that party's consent. Immediately before Paragraph 3.4. of the

---

of the first, second, and third anniversaries of the Effective Date . . . Notwithstanding the preceding sentence, if Executive's employment is terminated for any reason . . .").

[42] *Id.*

Omnibus Incentive Plan—quoted in SandRidge's Answer and Counterclaim and stating that the Compensation Committee's decisions are "final"—Paragraph 3.3 states that the Compensation Committee has "the authority . . . to construe and interpret the terms and provisions of the Plan and any award issued under the Plan (and any Award Agreements relating thereto)."[43]   Paragraph 3.3 then expressly states, ***"[n]othwithstanding the foregoing, no action of the Committee under this Section 3.3 shall impair the rights of any Participant without the Participant's consent***."[44]  Thus, here, the terms of the parties' written agreement govern the meaning of Paragraph 5—not a retroactive interpretation adopted by the Compensation Committee that is plainly contrary to those terms.

Third, reinforcing these points, the Employment Contract confirms that the terms of the letter agreement (Exhibit 2) override any inconsistency with the terms of the Omnibus Incentive Plan (Exhibit 3):

1. <u>Agreement</u>.  This letter agreement (the "Agreement") describes the terms and conditions of Executive's employment and supersedes and preempts in all respects any prior understandings, agreements or representations by or between the parties, written or oral, which may have related in any manner to the subject matter hereof.  **In the event of any inconsistency between the provisions of this Agreement and any other plan, program, practice or agreement in which Executive is a participant or a party, this Agreement shall control.**  On the Effective Date, Executive shall become an "at will" employee as defined under Oklahoma state law.[45]

---

[43] Exhibit 3 (Omnibus Incentive Plan) ¶ 3.3.

[44] *Id*. (emphasis added).

[45] Exhibit 2 (Employment Contract) ¶ 1 (emphasis added).

III.   **SandRidge Breached Paragraph 5 of the Employment Contract by Failing to Settle and Transfer the RSUs at Issue.**

Once Giesler's interpretation is adopted, as it should be, it is clear that Paragraph 5 of the Employment Contract has been breached as a matter of law. Paragraph 5 requires, in the event Giesler's employment was terminated "for any reason other than Cause"[46] after the Compensation Date of June 15, 2020 but before the third Vesting Date of April 6, 2023, payment of the portion of RSUs not vested before the termination according to the Formula. It is undisputed that Giesler voluntarily terminated his employment for reasons other than Cause on July 16, 2021, within the specified time frame. It is also undisputed that SandRidge has not transferred to Giesler any of the RSUs at issue. Thus, Giesler is entitled to a determination that SandRidge has breached Paragraph 5 as a matter of law.

IV.   **As a Matter of Law, Giesler Is Owed 284,323 Restricted Stock Units, Settled in Shares of SandRidge Common Stock.**

There is no dispute concerning the proper calculation of the portion of unvested RSUs owed to Giesler using the Paragraph 5 Formula. Paragraph 5 entitled Giesler upon termination of his employment to "the product of the number of the Initial RSU Grant shares that are not vested as of Executive's employment termination, multiplied by a

---

[46] Cause, "as defined in the Incentive Plan," required "(i) refusal or neglect to perform Participant's duties with the Company; (ii) breach of a written policy of the Company as in effect from time to time; (iii) commission of an act of fraud or dishonesty resulting in economic or financial injury to the Company; (iv) engagement in illegal conduct or gross misconduct; (v) breach of any agreement with the Company or an Affiliate; (vi) indictment for, conviction of, or a plea of guilty or nolo contendere to any felony or other crime involving moral turpitude; or (vii) failure to reasonably cooperate, following a request to do so by the Company, in any internal or governmental investigation of the Company or any of its Affiliates." Exhibit 3 (Omnibus Incentive Plan) ¶ 2.5.

fraction, the numerator of which is the number of days between the Effective Date and the date of Executive's employment termination, and the denominator of which is 1095."[47] "[T]he number of the Initial RSU Grant shares that are not vested as of Executive's employment termination" was 666,666.66 (two thirds of the 1,000,000 total Initial RSU Grant). That number is multiplied by the fraction 467/1095, consisting of the number of days between the Effective Date of April 6, 2020 and termination of Giesler's employment on July 16, 2021 (467), over 1095 (which is the number of days in three years). Thus, according to the Formula, Giesler was entitled to receive upon termination of his employment 284,323 RSUs (*i.e.*, 666,666.66 x (467/1095)).

## CONCLUSION

For the reasons stated above, Giesler respectfully requests that the Court grant summary judgment in his favor determining that: (1) the phrase "employment is terminated" includes a voluntary termination such that, upon Giesler's resignation from SandRidge on July 16, 2021, the Employment Contract required SandRidge to settle in shares and convey to him a portion of previously unvested RSUs according to the Formula; (2) SandRidge has breached that obligation through its failure to convey to Giesler such RSUs settled in shares; and (3) the amount of RSUs, settled in common stock, SandRidge owes Giesler under the Employment Contract is 284,323 shares of SandRidge common stock.

---

[47] Exhibit 2 (Employment Contract) ¶ 5.

Respectfully submitted,

*s/Phillip G. Whaley*
Phillip G. Whaley, OBA No. 13371
**RYAN WHALEY**
400 North Walnut Avenue
Oklahoma City, OK 73104
Telephone: (405) 239-6040
Facsimile: (405) 239-6766
Email: pwhaley@ryanwhaley.com

Brandon T. Allen (admitted *pro hac vice*)
Jean C. Frizzell (admitted *pro hac vice*)
**REYNOLDS FRIZZELL LLP**
1100 Louisiana Street, Suite 3500
Houston, TX 77002
Telephone: (713) 485-7200
Facsimile: (713) 485-7250
Email: allen@reynoldsfrizzell.com
Email: jfrizzell@reynoldsfrizzell.com

*ATTORNEYS FOR PLAINTIFF*
*CARL GIESLER, JR.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2021, I electronically transmitted the attached document to the Clerk of Court using the Electronic Filing System for filing. Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the ECF System.

*s/Phillip G. Whaley*
Phillip G. Whaley

27