# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

CARL GIESLER, JR.,

             Plaintiff,

v.

SANDRIDGE ENERGY, INC.,

             Defendant.

Case No. CIV-21-0904-HE

---

**DEFENDANT SANDRIDGE ENERGY, INC.'S COMBINED BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

RESPONSE TO GIESLER'S STATEMENT OF UNDISPUTED FACTS ...................... 3

CROSS-STATEMENT OF ADDITIONAL UNDISPUTED FACTS............................. 6

STANDARD OF LAW ............................................................................................... 7

ARGUMENT.............................................................................................................. 7

I.    It is Clear that the Parties Did Not Intend "Termination" to Include a Voluntary Resignation ...................................................................................................... 7

      A.   The Long-Term Incentive Award only makes sense and accomplishes the stated purpose if "terminate" excludes resignation. ........................................................ 8

      B.   The context of the text of the Long-Term Incentive Award itself makes clear that that "termination" does not include a voluntary resignation ...................... 17

      C.   The context of the Incentive Plan similarly evidences that "termination" does not include a voluntary resignation.................................................................. 19

      D.   Giesler's attempts to dismiss SandRidge's reasonable interpretation are circular and unpersuasive .................................................................................. 21

II.    Even Assuming an Ambiguity Exists, SandRidge's Compensation Committee Exercised its Authority to Resolve that Ambiguity and Concluded that the Vesting Formula Does Not Apply in the Event of a Voluntary Resignation ...................... 22

III.   Discovery is Necessary to Resolve Any Remaining Ambiguity ............................ 26

IV.   Giesler's Position that He is Entitled to "284,323 Restricted Stock Units, Settled in Shares of SandRidge Common Stock" is Incorrect ................................................ 27

CONCLUSION ........................................................................................................ 28

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................... 7

*Barnes v. Townley*,
448 P.2d 468 (Okla. 1968) ................................................................... 18–19

*Chadwell v. English*,
652 P.2d 310 (Okla. Civ. App. 1982) ......................................................... 28

*Connery v. Columbia/HCA Healthcare Corp.*,
986 S.W.2d 6 (Tenn. Ct. App. 1998) .......................................................... 14

*Covinsky v. Hannah Marine Corp.*,
388 Ill. App. 3d 478 (Ill. App. Ct. 2009) ............................................ *passim*

*Fortner v. Wilson*,
216 P.2d 299 (Okla. 1950) ......................................................................... 28

*Francis v. Francis*,
285 P.3d 707 (Okla. Civ. App. 2012) ........................................................... 9

*Garcia v. Garcia*,
288 P.3d 931 (Okla. 2012) .................................................................. 16–17

*Lucente v. Int'l Bus. Machs. Corp.*,
310 F.3d 243 (2d Cir. 2002) ....................................................................... 28

*Maxim Grp. LLC v. Life Partners Holdings, Inc.*,
690 F. Supp. 2d 293 (S.D.N.Y. 2010) ........................................................ 28

*McInerney v. United Air Lines, Inc.*,
463 F. App'x 709 (10th Cir. 2011) .............................................................. 16

*Mercury Inv. Co. v. F.W. Woolworth Co.*,
706 P.2d 523 (Okla. 1985) .................................................................... 8, 19

*Parker v. Bd. of Regents of Tulsa Jr. Coll.*,
981 F.2d 1159 (10th Cir. 1992) .................................................................. 16

*Persson v. Scotia Prince Cruises, Ltd.*,
   330 F.3d 28 (1st Cir. 2003) ...................................................................... 14

*Pitco Prod. Co. v. Chaparral Energy, Inc.*,
   63 P.3d 541 (Okla. 2003) ......................................................................... 23

*Plano Petroleum, LLC v. GHK Expl. L.P.*,
   250 P.3d 328 (Okla. 2011) ....................................................................... 27

*Poff v. Oklahoma ex rel. Dep't of Hum. Servs.*,
   No. CIV-15-936-R, 2017 WL 5618597 (W.D. Okla. Nov. 20, 2017) ....................... 17

*Price v. State ex rel. State Emps. Grp. Health, Dental & Life Ins. Bd*,
   757 P.2d 839 (Okla. 1988) ....................................................................... 15

*QuikTrip Corp. v. Abatement Sys., Inc.*,
   281 P.3d 250 (Okla. Civ. App. 2012) ......................................................... 27

*Red Rock Distrib. Co. v. State ex rel. Reneau*,
   993 P.2d 142 (Okla. Civ. App. 1999) ......................................................... 15

*Russell v. Bd. of Cnty. Comm'rs of Carter Cnty.*,
   1 P.3d 442 (Okla. Civ. App. 2000) ............................................................ 28

*Stevens v. Perry*,
   11 F. App'x 704 (9th Cir. 2000) ............................................................... 17

*Texaco, Inc. v. Holsinger*,
   336 F.2d 230 (10th Cir. 1964) ............................................................ 13, 14

*Thurston v. State Farm Mut. Auto. Ins. Co.*,
   478 P.3d 415 (Okla. 2020) ................................................................. 13, 14

*Urology Ctr. of S. Oklahoma v. Miller*,
   246 P.3d 736 (Okla. Civ. App. 2010) ................................................... 15–16

*W. Steel Erection Co. v. Gatlin*,
   319 P.2d 607 (Okla. 1957) ....................................................................... 15

*WinCo Foods, LLC v. Crossland Constr. Co., Inc.*,
   426 F. Supp. 3d 1147 (W.D. Okla. 2019) (Heaton, J.) ...................................... 7

**Statutes**

Okla. Stat. tit. 15, § 152 ............................................................................... 9

Okla. Stat. tit. 15 § 163 ................................................................................ 27

Okla. Stat. tit. 15 § 166 .................................................................................. 8

**Other Authorities**

*Black's Law Dictionary* ........................................................................ 8–9, 13

Fed. R. Civ. P. 56(a) ...................................................................................... 7

Fed. R. Civ. P. 56(c) ...................................................................................... 1

Jared Lewis, *What is the Difference Between a Resignation and a
Termination?* Houston Chronicle, Mar. 7, 2019 ........................................ 16

Local Rule 7.1(c) ........................................................................................... 1

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 7.1(c), Defendant SandRidge Energy, Inc. ("SandRidge"), through its undersigned counsel, submits this combined brief in opposition to Plaintiff Carl Giesler, Jr.'s ("Giesler") Motion for Partial Summary Judgment (ECF No. 28) (hereinafter, the "Motion") and in support of Defendant's Cross-Motion for Partial Summary Judgment (hereinafter, the "Cross-Motion").

## INTRODUCTION

Giesler does not dispute that the Long-Term Incentive Award contained within his Employment Agreement is intended to do just that—incentivize him to remain at SandRidge "long term." Despite this intent, Giesler is attempting to manipulate the agreement to support his contention that he should receive a windfall for quitting. Giesler's interpretation, however, is illogical, and the Parties' intent is clear—specifically, that the vesting of additional shares pursuant to the Long-Term Incentive Award applies *only* if SandRidge terminates Giesler's employment without cause, not if he voluntarily resigns to pursue another opportunity (as was the case here).

Indeed, Giesler's interpretation leads to several illogical results that defy the Parties' express intent. For example, rather than incentivize him to remain at SandRidge "long term," Giesler's reading creates perverse incentives for him to quit his position early in the three-year term, and particularly to quit soon after an anniversary date, rather than to fulfill the entire three-year period contemplated by the agreement. This is what happened here, as Giesler now seeks a windfall in the form of 284,323 *additional* shares, on top of the 333,334 shares he has already received, for working only fifteen out of the thirty-six

months contemplated by the Parties' agreement.  In other words, Giesler seeks to receive more than *sixty percent* of the total available shares despite working only *forty percent* of the relevant time period.  The Court should reject this illogical reading.  Rather, the Court should endorse SandRidge's reading of the relevant provision, which conforms to the entirety of the Parties' agreement, harmonizes with the Parties' intent, and comports with the word "termination" as it is used in the remainder of the agreement.

In the alternative, the Court should find that the provision at issue is at least ambiguous.  In that event, the Court should find that SandRidge's Compensation Committee resolved such ambiguity, pursuant to its express authority, when it considered in good faith and ultimately rejected Giesler's request for windfall shares.  Such a determination is final and binding on the Parties, and Giesler cannot now avoid this decision merely because he is dissatisfied with the result.

The fact is that the Parties intended the Long-Term Incentive Award to encourage Giesler to remain at SandRidge "long term."  Giesler's decision to thwart that intention by resigning early should not entitle him to millions of dollars in unearned compensation.  Accordingly, SandRidge respectfully requests that, based on the plain intent and language of the Parties' agreement, the Court deny Giesler's Motion and grant SandRidge's Cross-Motion for Partial Summary Judgment on the following issues: (1) that Giesler is not entitled to the vesting of any additional shares of SandRidge stock following his voluntary resignation from SandRidge; and (2) that SandRidge is therefore not in breach of the Employment Agreement for declining to pay him such unearned stock.

## RESPONSE TO GIESLER'S STATEMENT OF UNDISPUTED FACTS

1.      Undisputed that SandRidge hired Giesler to act as its Chief Executive Officer on or around April 6, 2020.  However, SandRidge notes that Exhibit 2 to Giesler's Motion is an unexecuted copy of the April 6, 2020 agreement between Giesler and SandRidge (hereinafter, the "Employment Agreement").  Accordingly, Exhibit A to the attached Declaration of Chad B. Walker (hereinafter, the "Walker Declaration") is a true and correct copy of SandRidge's Form 8-K, filed April 7, 2020, which contains an executed copy of the Employment Agreement.  *See* Walker Decl., Ex. A at 4–6.  SandRidge further notes that the Employment Agreement expressly incorporates SandRidge's 2016 Omnibus Incentive Plan (As Amended and Restated as of August 8, 2018).  *See* ECF No. 28-3 (hereinafter, the "Incentive Plan").

2.      Disputed. SandRidge disputes Giesler's characterization of the express language of Paragraph 5 of the Employment Agreement (the "Long-Term Incentive Award").  The Parties' undisputed intent with the Long-Term Incentive Award was to incentivize Giesler to remain at SandRidge "long term."  The provision operated by granting Giesler 1 million Restricted Stock Units ("RSUs") as of the Effective Date (April 6, 2020).  Those RSUs would then vest in three equal parts on the first three anniversaries of the Effective Date so long as Giesler remained employed by SandRidge.  This vesting schedule provided an incentive for Giesler to remain at SandRidge for the entirety of each year and for the full three-year term, confirming the intent of the Long-Term Incentive Award.  SandRidge includes here the language of the Long-Term Incentive Award in full:

**<u>Long-Term Incentive Award</u>**.  Effective as of the Effective Date, you will receive an award of 1,000,000 Restricted Stock Units (the "Initial RSU Grant") under the 2016 Omnibus Incentive Plan (As Amended and Restated as of August 8, 2018) (the "Incentive Plan").  This Initial RSU Grant will be subject to the terms and conditions of the Incentive Plan, and will (i) be settled in shares of the Corporation's common stock upon vesting, and (ii) vest in three equal installments on each of the first, second, and third anniversaries of the Effective Date (the "Vesting Dates"). Notwithstanding the preceding sentence, if Executive's employment is terminated for any reason before the Compensation Date, Executive shall forfeit all of the Initial RSU Grant, and if Executive's employment is terminated after the Compensation Date but before the third Vesting Date, (x) for any reason other than Cause (as defined in the Incentive Plan), an additional portion of the unvested Initial RSU Grant shall be vested, equal to the product of the number of the Initial RSU Grant shares that are not vested as of Executive's employment termination, multiplied by a fraction, the numerator of which is the number of days between the Effective Date and the date of Executive's employment termination, and the denominator of which is 1095, and (y) for Cause, Executive shall forfeit all of the Initial RSU Grant, including any vested portion.  Upon a Change in Control (as defined in the Incentive Plan) the Initial RSU Grant shall vest in full and, if Executive's employment is terminated for any reason other than Cause (as defined in the Incentive Plan) either during (x) the 12 months immediately following or (y) the three months immediately preceding the Change in Control, Executive shall receive a lump sum payment equal to 1 times the sum of the Base Salary and the Target Bonus, which would be in lieu of any payments or benefits under the Corporation's Special Severance Plan and any other plan or program providing severance.

Employment Agreement ¶ 5.

3.      Disputed to the extent that Giesler attempts to characterize the express language of the Long-Term Incentive Award, which can be found in full in the above paragraph 2.

4.      Disputed to the extent that Giesler attempts to characterize the express language of the Long-Term Incentive Award, which can be found in full in the above paragraph 2.

5.      Disputed.  The purpose of the vesting formula provided within the Long-Term Incentive Award was to compensate Giesler should SandRidge terminate his

4

employment without cause (*i.e.*, it provides additional compensation in the form of severance), thus creating a disincentive for SandRidge to fire Giesler without cause and making it more likely that he remained employed "long term." The Long-Term Incentive Award was not intended to reward Giesler for voluntarily resigning from his position.

6.      Disputed to the extent that Giesler attempts to characterize the express language of the Long-Term Incentive Award, which can be found in full in the above paragraph 2.

7.      SandRidge does not dispute that Giesler elected to voluntarily resign from his position at Sandridge or around July 16, 2021 in order to accept a position at another company.  SandRidge disputes this paragraph to the extent that Giesler attempts to characterize the express language of the Long-Term Incentive Award, which can be found in full in the above paragraph 2.

8.      SandRidge disputes that the vesting formula in the Long-Term Incentive Award is applicable to Giesler, given his voluntary resignation from the Company.

9.      Undisputed that Giesler sent a letter to SandRidge on or around July 27, 2021 seeking an additional 284,323 unvested shares. *See* Walker Decl., Ex. B (hereinafter, the "Demand Letter").  As detailed below in SandRidge's Cross-Statement of Additional Undisputed Facts, SandRidge does not dispute that it rejected Giesler's demand for such unearned shares.  SandRidge does not dispute that Giesler filed his Complaint on September 15, 2021, but further notes that on November 24, 2021, SandRidge filed its Answer and Counterclaim.

## CROSS-STATEMENT OF ADDITIONAL UNDISPUTED FACTS

10.    Section 3.3 of the Incentive Plan, which is incorporated by reference into the Employment Agreement, provides that SandRidge's Compensation Committee "shall have the authority . . . to construe and interpret the terms and provisions of the Plan and any Award issued under the Plan (and any Award Agreements relating thereto) . . . . The Committee may correct any defect, supply any omission or reconcile any inconsistency in the Plan or in any agreement relating thereto in the manner and to the extent it shall deem necessary to effectuate the purpose and intent of the Plan."  Incentive Plan § 3.3.

11.    In addition, pursuant to Section 3.4 of the Incentive Plan, "[a]ny decision, interpretation or other action made or taken in good faith by or at the direction of the Company, the Board or the Committee (or any of its members) arising out of or in connection with the Plan shall be within the absolute discretion of all and each of them, as the case may be, and shall be final, binding and conclusive on the Company and all employees and Participants and their respective heirs, executors, administrators, successors and assigns." *Id.* § 3.3.

12.    Pursuant to the authority granted to it by Sections 3.3 and 3.4 of the Incentive Plan, on August 6, 2021, after receiving Giesler's July 27 Demand Letter but prior to Giesler filing his Complaint, SandRidge's Compensation Committee met and considered in good faith all relevant facts and documents (including the Employment Agreement, the Incentive Plan, and the Demand Letter) and resolved to "unanimously reject[] Mr. Giesler's claim that he is entitled to vesting of an additional portion of the Initial RSU Grant that remained unvested when [Giesler] quit as the Company's Chief Executive Officer." *See*

6

Walker Decl., Ex. C (hereinafter, the "Committee Letter").  On August 26, 2021, SandRidge's Compensation Committee responded to Giesler's Demand Letter, informing him of its decision and explaining in detail the basis for its interpretation of the word "termination."  *Id*.

## STANDARD OF LAW

Pursuant to Federal Rule of Civil Procedure 56(a), a party may move for summary judgment on any claim or defense, or any parts thereof, which shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  "Material facts are those which 'might affect the outcome of the suit under the governing law'" and "[a] dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *WinCo Foods, LLC v. Crossland Constr. Co., Inc.*, 426 F. Supp. 3d 1147, 1149 (W.D. Okla. 2019) (Heaton, J.) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "To determine whether this standard is met, the court views the evidence in the light most favorable to the non-moving party."  *Id.*

## ARGUMENT

**I.   It is Clear that the Parties Did Not Intend "Termination" to Include a Voluntary Resignation.**

The plain language of the Employment Agreement makes clear that Giesler is entitled to vesting of additional shares only in the event that *SandRidge* terminates his employment without cause, not if he voluntarily resigns.  Notwithstanding this fact, Giesler

has attempted to pull the words "employment is terminated" out of context to create an ambiguity where none exists.

But it is black letter law that "[a] contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context." *Mercury Inv. Co. v. F.W. Woolworth Co.*, 706 P.2d 523, 529 (Okla. 1985). And paramount over all, "[t]he court must interpret a contract so as to give effect to the intent of the parties at the time the contract was formed." *Id.*; *accord* Okla. Stat. tit. 15 § 166 ("Particular clauses of a contract are subordinate to its general intent.").

Here, when giving meaning to the Parties' intent in the Long-Term Incentive Award and viewing the relevant provisions in context with the entirety of the Parties' agreement, Giesler's interpretation is revealed as unsupportable as a matter of law. Instead, "termination" can mean only one thing in the context of this provision—termination by SandRidge, not by voluntary resignation.

### A. The Long-Term Incentive Award only makes sense and accomplishes the stated purpose if "terminate" excludes resignation.

Depending on the context, the phrase "employment is terminated" is subject to multiple meanings (*see infra* at 15–17). And despite Giesler's assertion otherwise (*see* Mot. at 17), *Black's Law Dictionary*'s definition of "terminate" as "to end" provides no help in resolving this potential[1] ambiguity, as it is silent as to whether the word "terminate"

---

[1] The ambiguity is merely potential because the meaning can be made clear by its context. As explained herein, the context clarifies that the meaning of termination excludes resignation.

includes or excludes resignation.  Therefore, the intent of the word "terminate" must be determined from the larger context.

Although there is no case on all fours decided under Oklahoma law, an appellate court in Illinois has addressed how to interpret a similar provision under essentially the same legal principles as here (discussed in more detail below).  *See Covinsky v. Hannah Marine Corp.*, 388 Ill. App. 3d 478, 483–87 (Ill. App. Ct. 2009).  As Giesler does here, the employee argued that the *Black's Law Dictionary* definition of "termination" required inclusion of resignation.  *Id.*  The court rejected this argument, instead relying on the context of the term in the agreement to find that it *excluded* resignation:

> [G]iving 'termination' its plain and ordinary meaning in an employment context [using *Black's Law Dictionary*], it means an end to employment and could mean a voluntary resignation, an involuntary termination or both . . . , [but after] reading [the relevant provision] in context with the entire contract, 'termination' as used therein is not at all ambiguous and clearly refers to an involuntary termination, not to a voluntary resignation.

*Id.*

Like in *Covinsky*, no dictionary can settle the issue here, so the court must look at the context of the agreement as a whole to determine the Parties' intent, including whether the provision at issue makes logical sense under each Party's proposed interpretation.  *See* Okla. Stat. tit. 15, § 152 ("A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful."); *Francis v. Francis*, 285 P.3d 707, 712 (Okla. Civ. App. 2012) ("In the construction of contracts, it is the duty of the court to place itself, as far as possible,

in the situation of the parties at the time their minds met upon the terms of the agreement, and from a consideration of the writing itself, ascertain their intention.").

Here, the express intent of the provision is satisfied only if resignation is excluded. Indeed, the purpose of the provision is explicit from its title itself—"Long-Term Incentive Award"—namely, to incentivize Giesler to remain at SandRidge "long term."   When viewed in this light, Giesler's claim that a voluntary resignation constitutes "termination" under this provision quickly falls apart, as it results in at least three separate perverse incentives that encourage him to quit—and quit relatively early—rather than remain at SandRidge "long term."

*First*, Giesler's interpretation leads to the illogical result that by resigning, he earns a higher percentage of shares than the proportion of time that he has worked, creating an incentive for him to quit early and receive a windfall.   For example, under Giesler's interpretation, if he quits on the first day of the second period (*i.e.*, April 6, 2021), he receives 333,334 shares (by virtue of it being the First Anniversary of the Effective Date) *plus* an additional one third of the *remaining* unvested shares (*i.e.*, one third of 666,666 shares) pursuant to the vesting formula.[2]   In other words, Giesler claims that, despite working *zero* days of the second period, he is entitled to an *additional* 222,222 shares, giving him a total of 555,556 shares for working only one out of the three years

---

[2] The vesting formula provides that if Giesler's employment is terminated for a reason other than cause, "an additional portion of the unvested Initial RSU Grant shall be vested, equal to the product of the number of the Initial RSU Grant shares that are not vested as of Executive's employment termination, multiplied by a fraction, the numerator of which is the number of days between the Effective Date and the date of Executive's employment termination, and the denominator of which is 1095."  Employment Agreement ¶ 5.

contemplated by the agreement—*i.e.*, under Giesler's interpretation, Giesler would receive **55.6%** of the total shares despite working only **33.3%** of the total time. This reading thus encourages him to quit and defies the express purpose of the provision to incentivize staying the full three-year term.[3]

Instead, this vesting of additional shares makes sense—and indeed comports with the stated purpose of the provision—only if *SandRidge* is the party that terminates Giesler, as it provides extra compensation (*i.e.*, severance or a "buyout") in the event that SandRidge terminates Giesler's employment without cause. Employment Agreement ¶ 5. Such a reading aligns with the express intent of the Parties, as it encourages Giesler to work the remainder of each term (to reach the next vesting period) while simultaneously discouraging SandRidge from firing Giesler without cause (or else provide extra severance compensation to Giesler). This is logical, aligns with common business practices, and accomplishes the stated purpose of the provision; Giesler's interpretation does not.

*Second*, in addition to incentivizing Giesler to quit rather than remain "long term," Giesler's interpretation creates a particularly strong perverse incentive to quit at or towards the *beginning* of a year when his windfall is greatest (as happened here) rather than work until the end of a year. Looking again at the first day of the second period, Giesler's interpretation would entitle him to 55.6% of the shares despite working only 33.3% of the

---

[3] Giesler's claims in this lawsuit illustrate this perverse incentive. Indeed, Giesler voluntarily resigned from his position on July 16, 2021 and now claims to be entitled to an additional 284,323 shares despite already receiving 333,334 shares on April 6, 2021. Put differently, Giesler seeks to net 617,657 shares—61.8% of the total available—despite working only 42.6% of the three-year period.

time, a windfall of **22.3%**,[4] whereas on the last day of that same period he would have earned 77.7%[5] of the shares having worked 66.7% of the period, a windfall of only **11%**. Giesler would therefore be incentivized to quit at or toward the *beginning* of the second period (this holds true in the third period as well) in order to maximize his windfall, thus thwarting the express intent of the Parties.

*Third*, Giesler's interpretation leads to the illogical result that his incentive to stay at the Company decreases each successive year during the three-year term, incentivizing him to quit sooner into the term rather than later.  Under Giesler's logic, if he quits on the First Anniversary, he receives 555,556 shares,[6] if he quits on the Second Anniversary he receives 888,889 shares,[7] and if he quits on the Third Anniversary, he receives the full 1 million shares.  Stated differently, working the second year of his contract nets him an additional 333,333 shares and working the final year of his contract nets him a mere 111,111 additional shares.  Thus, under Giesler's reading, his incentive to stay at SandRidge decreases year-over-year, making it increasingly unlikely that Giesler actually remains at SandRidge "long term."  Indeed, why would Giesler work the final ***third*** of the three-year period (*i.e.*, April 6, 2022 to April 6, 2023) when he has already earned nearly ***ninety percent***[8] of his stock incentive (which makes up the lion's share of his overall compensation)?  This, again, makes no sense.

---

[4] 333,334 + (365/1095 x 666,666) = 555,556 out of the total 1,000,000 shares.

[5] 333,334 + (729/1095 x 666,666) = 777,169 out of the total 1,000,000 shares.

[6] 333,334 + (365/1095 x 666,666) = 555,556 shares.

[7] 666,667 + (730/1095 x 333,333) = 888,889 shares.

[8] 666,667 + (730/1095 x 333,333) = 888,889 out of the total 1,000,000 shares.

When viewed in light of the stated purpose of the Long-Term Incentive Award, Giesler's interpretation is unsupportable as a matter of law. *See Thurston v. State Farm Mut. Auto. Ins. Co.*, 478 P.3d 415, 421 (Okla. 2020) (finding that the plaintiff's "interpretation would be absurd and therefore must be avoided"); *Texaco, Inc. v. Holsinger*, 336 F.2d 230, 235 (10th Cir. 1964) ("We must also follow the rule that . . . reasonable, rather than unreasonable, interpretations are favored by the law and results which vitiate the purpose or reduce the terms of the contract to an absurdity should be avoided.").

*Covinsky* is highly instructive here on how context determines the meaning. 388 Ill. App. 3d 478 (2009).[9]  In *Covinsky*, the court analyzed an employment agreement that provided that "[i]n the event that [the company] is sold, merged with another corporation, or there is a change in the present ownership which results in the termination of the Employee's employment as President and Chief Executive Officer . . . , [the company] shall pay to Employee an amount equal to eighteen (18) months' salary as set forth under the contract salary rate then in existence." *Id.* at 482.  After considering *Black's Law Dictionary* and other various definitions of the word "terminate," the court concluded that when reading the relevant provision "in context with the entire contract, 'termination' as used therein is not at all ambiguous and clearly refers to an involuntary termination, not to a voluntary resignation." *Id.* at 484.  The court reached such a conclusion because, among other things, other provisions in the contract referenced termination "for cause" (an action

---

[9] While the court in *Covinsky* applied the law of a different state, SandRidge has not located any cases construing similar contractual provisions under Oklahoma law, and the court in *Covinsky* analyzes nearly identical contractual provisions to those at issue here and relies on fundamental rules of contractual interpretation that would be equally applicable here.

that can be taken only at the volition of the employer, as discussed below) and interpreting "termination" to include voluntary resignation in the relevant provision would lead to the perverse result that an "employee who voluntarily resigns upon a sale, merger or change in ownership of his employer gets rewarded with 18 months' salary for his inability or refusal to work with the new owner or management." *Id.* at 486. Put more finely, the court explained that if "'termination' encompasses a voluntary resignation, the employee has no incentive to continue in his position and to make the transition to the new owner/management because he knows, if he resigns upon the transition, he will receive a substantial payout. He will be rewarded for not doing his job. . . . This makes no sense." *Id.*

So too here. Reading termination to include voluntary resignation would lead to the illogical result that Giesler is rewarded for quitting his job. Such a reading therefore creates a perverse incentive for him to quit and thwarts the express purpose of the Long-Term Incentive Award. It must therefore be rejected. *See Thurston*, 478 P.3d 415 at 421; *Texaco*, 336 F.2d at 235; *see also Covinsky*, 388 Ill. App. 3d at 486; *Persson v. Scotia Prince Cruises, Ltd.*, 330 F.3d 28, 32 (1st Cir. 2003) (affirming district court's "determination that [employees] resigned and were therefore not entitled to termination pay under their employment contracts"); *Connery v. Columbia/HCA Healthcare Corp.*, 986 S.W.2d 6, 10 (Tenn. Ct. App. 1998) (finding that employees "who refused continued employment or resigned were not entitled to termination pay"). Further, as discussed in Section I.B, *infra*, "terminated" is connected with the concepts of "cause" and "other than for cause," concepts which strongly suggest an action by the employer rather than a self-inflicted

action.  The context therefore clearly shows that "termination" does not include a voluntary resignation.

Giesler's citation to (once again) out-of-context case law does not alter this conclusion.  Indeed, *none* of the four principal cases cited by Giesler stand for the proposition that a voluntary resignation constitutes "termination" under the language of an employment agreement.  *See* Mot. at 17–18.  Rather, each case merely references "voluntary termination" in passing, does not even purport to stand for the proposition that "termination" in a contract must include resignation, and does not use the term in similar contexts as used here:

- *Price v. State ex rel. State Emps. Grp. Health, Dental & Life Ins. Bd*, 757 P.2d 839, 841 (Okla. 1988).  In *Price v. State*, the court referenced an employee quitting as a "voluntary termination of employment" but did not address the issue of whether quitting would constitute "termination" under the language of a contract, as that issue was not in dispute in that disability benefits case.

- *W. Steel Erection Co. v. Gatlin*, 319 P.2d 607, 610 (Okla. 1957).  In *Western Steel*, the court analyzed a contract with language differentiating between "quitting" and "termination for cause" and resolved a dispute over whether a joint agreement by the parties to end an employee's employment constituted "quitting."  The court did not, however, address whether a resignation would constitute a "termination."

- *Red Rock Distrib. Co. v. State ex rel. Reneau*, 993 P.2d 142, 143 (Okla. Civ. App. 1999).  In *Red Rock*, the court resolved a dispute over whether an employee who resigned forfeited various benefits when the contract provided that those who "voluntarily resign their position forfeit all earned but unused benefits at the time that their notice is tendered."  The court used the term "voluntary termination" only in passing and did not address whether a resignation constitutes "termination."

- *Urology Ctr. of S. Oklahoma v. Miller*, 246 P.3d 736, 737 (Okla. Civ. App. 2010).  In *Urology Center*, the court resolved a dispute over entitlement to disability benefits under the Oklahoma Worker's Compensation Act and referenced an employee terminating his employment, but once again did not

address the central issue here of whether or not resignation would constitute "termination" under the terms of an agreement (of which there was none at issue).

At most, such cases show that the word "termination" used as a general matter can *sometimes* include voluntary resignation, but they do not support the proposition that the word "termination" *always* includes voluntary resignation, or that it includes it in the context of this agreement. Indeed, many courts (including the Tenth Circuit and the Supreme Court of Oklahoma) have expressly distinguished the concept of a "termination" (meaning termination by the employer) from a "voluntary resignation."[10]   *See, e.g.,* *McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 720 (10th Cir. 2011) (finding that "[t]ermination of employment is 'clearly an adverse employment action'" but resignation is not, thereby excluding resignation from its use of the word "termination"); *Parker v. Bd. of Regents of Tulsa Jr. Coll.*, 981 F.2d 1159, 1162 (10th Cir. 1992) (finding that an employer giving its employee "a choice between resignation or termination does not establish that the resignation was involuntary," thereby using "termination" as excluding "resignation"); *Garcia v. Garcia*, 288 P.3d 931, 935 (Okla. 2012) (finding that "a decision

---

[10] Giesler's citation to Indeed.com (Mot. at 17 n.33) is similarly unpersuasive, as it is far from a definitive source on the subject and similar sources state the exact opposite. For example, Giesler's home-town paper, the Houston Chronicle, explains that "[t]he primary difference between termination and resignation is in who initiates the severance of employment: Resignation means the employee has decided to sever the employment. We usually call this quitting. Termination means the employer has decided to sever the employment. We call this being fired, terminated or laid off." Jared Lewis, *What is the Difference Between a Resignation and a Termination?*, Chron (Mar. 07, 2019), https://smallbusiness.chron.com/difference-between-resignation-termination-15596.html. Such anecdotal evidence merely illustrates that termination sometimes excludes resignation and sometimes includes it, depending on the context in which it is used.

to resign rather than face termination is not a voluntary decision"); *Poff v. Oklahoma ex rel. Dep't of Hum. Servs.*, No. CIV-15-936-R, 2017 WL 5618597, at *1 (W.D. Okla. Nov. 20, 2017) (discussing "resign[ing] in lieu of termination"); *Stevens v. Perry*, 11 F. App'x 704, 705 (9th Cir. 2000) (finding "[t]here was no evidence that [the defendant] had any personal involvement in the decision to treat [the plaintiff]'s departure as a resignation rather than a termination").

Taking these cases together, the meaning of "termination" in an employment contract plainly depends on its context.  Here, in the context of the stated purpose of Long-Term Incentive Award, "termination" unambiguously excludes voluntary resignation.  *See Covinsky*, 388 Ill. App. 3d at 486.

### B. The context of the text of the Long-Term Incentive Award itself makes clear that that "termination" does not include a voluntary resignation.

In addition to accomplishing the stated purpose of the provision, interpreting "termination" to exclude resignation comports with the immediate context of the provision. For example, the Long-Term Incentive Award includes a Change in Control provision that uses "terminated" in a similar way:

> if Executive's employment is terminated for any reason other than Cause . . . either during (x) the 12 months immediately following or (y) the three months immediately preceding [a] Change in Control, Executive shall receive a lump sum payment equal to 1 times the sum of the Base Salary and the Target Bonus, which would be in lieu of any payments or benefits under the Corporation's Special Severance Plan and any other plan or program providing severance.

Employment Agreement ¶ 5.

17

Such a clause provides a 'golden parachute' for Giesler, granting a "lump sum payment . . . *in lieu of* . . . *severance*" if his "employment is terminated" immediately before or after a Change in Control. *Id.* (emphasis added).  By using the term "severance," the Parties clearly intended "employment is terminated" to apply only if SandRidge fires Giesler, not if he voluntarily resigns, because a voluntary resignation would not entitle him to any "severance."  Indeed, this entire Change in Control provision would become illogical if "termination" were defined to include voluntary resignation, as it would mean that Giesler would be entitled to a lump sum reward for quitting either before or after a Change in Control, in effect rewarding him for refusing to work for a new owner.  As detailed above, this exact issue was squarely addressed by the court in *Covinsky*, which held that "termination" in the underlying employment agreement *excluded* resignation because otherwise, it would lead to the illogical result that an "employee who voluntarily resigns upon a sale, merger or change in ownership of his employer gets rewarded with 18 months' salary for his inability or refusal to work with the new owner or management."  *Covinsky*, 388 Ill. App. 3d at 484.  So too here.

In addition, as was the case in *Covinsky*, the Long-Term Incentive Award also specifically provides that Giesler forfeits all previously vested shares if his "employment is terminated . . . for Cause."  *Id.*  Because Giesler cannot resign "for cause," this language suggests that "termination" was used in this part of the contract to refer only to termination *by SandRidge*, excluding resignation.  *See Covinsky*, 388 Ill. App. 3d at 484; *see also Barnes v. Townley*, 448 P.2d 468, 470 (Okla. 1968) ("Words used in one sense in one part of a contract are deemed to have been used in the same sense in another part of the same

18

instrument, where the context does not indicate otherwise.").[11]  Thus, looking at the word

"termination" in context with the entire Long-Term Incentive Award supports SandRidge's

interpretation.

### C. The context of the Incentive Plan similarly evidences that "termination" does not include a voluntary resignation.

The conclusion that "termination" excludes voluntary resignation is supported not

only by the Parties' stated purpose and the language of the Long-Term Incentive Award

itself, but also by the plain language of the remainder of the Parties' agreement.  Here, in

addition to the terms of the Employment Agreement, the Court must also consider the terms

of the Incentive Plan, which, as conceded in the Motion (*see* Mot. at 19), is incorporated

by reference into the Employment Agreement.  *See* Employment Agreement ¶ 5

("Effective as of the Effective Date, you will receive an award of 1,000,000 Restricted

Stock Units . . . under the [Incentive Plan].  This Initial RSU Grant will be subject to the

terms and conditions of the Incentive Plan . . . ."); *see also Mercury Inv. Co. v. F.W.*

*Woolworth Co*., 706 P.2d 523, 529 (Okla. 1985) ("A contract must be considered as a

whole so as to give effect to all its provisions without narrowly concentrating upon some

clause or language taken out of context." ).

In the Incentive Plan, "termination" clearly excludes voluntary resignation.  As even

Giesler recognizes, "the Employment Contract demonstrates that, when they so intended,

---

[11] Indeed, the Incentive Plan explicitly contains a sister term to "Cause" in the event of a voluntary resignation—namely "Good Reason."  *See* Incentive Plan § 2.22.  By not including the concept of "Good Reason" in the Employment Agreement, the Parties plainly did not contemplate that this provision would apply in the event of a voluntary resignation.

the parties clearly knew how to draw and did draw a distinction between 'involuntary termination' and 'voluntary termination.'" *See* Mot. at 19. But what Giesler ignores is the fact that the term "voluntary termination" appears in the Incentive Plan under the term "Voluntary Resignation" and is, in fact, explicitly *excluded* from such definition. *See* Incentive Plan § 6.4(h). This is because a "voluntary termination," as it is used in the Incentive Plan, refers to an employee electing to resign instead of facing a termination for cause. *See id.* §§ 6.4(h), (i). Thus, *both* "voluntary termination" and "involuntary termination" refer to termination at the discretion of the Company and not a purely volitional decision by the employee to quit. The word "termination," without a modifier, must therefore refer to the same.

Moreover, the Incentive Plan contains numerous provisions that expressly describe and contemplate an employee quitting, and it uses the unambiguous term "resignation" to refer to such events. *See* Incentive Plan §§ 2.22, 6.4(h). The fact that Parties elected *not* to use the term "resignation" in the Long-Term Incentive Award, and to instead use the word "terminated" alone, evidences the fact that the Parties did not intend to have the word "terminated" include a purely voluntary resignation by the employee.[12]

---

[12] What should not be lost in this dispute is the plain meaning of the word "termination." Although Giesler cites to various unpersuasive sources claiming that a resignation constitutes termination, the fact remains that this is generally not how people speak in the employment context. People do not say "I terminated my employment" when explaining that they quit their job. Rather, they say, "I quit my job" or "I resigned as CEO." By contrast, if someone was fired, they would explain "I was terminated."

### D. Giesler's attempts to dismiss SandRidge's reasonable interpretation are circular and unpersuasive.

Giesler makes several arguments attempting to refute SandRidge's plain-language interpretation, none of which are persuasive. *First*, Giesler repeatedly claims that SandRidge's interpretation "necessarily adds words that do not exist in the key contract phrase at issue." Mot. at 4, 15, 17. But this argument is circular. Indeed, if "termination" excludes voluntary resignation, which is the question at issue here, then no additional language need be added.

*Second*, Giesler takes the position that "the Employment Contract demonstrates that, when they so intended, the parties clearly knew how to draw and did draw a distinction between 'involuntary termination' and 'voluntary termination,'" and chose not to do so (Mot. at 19). But, as detailed *supra*, this argument ignores the fact the Incentive Plan uses the term resignation to specify that a provision can be triggered by the employee's own action, which the Parties intentionally omitted from the Long-Term Incentive Award.[13] *See* Incentive Plan §§ 2.22, 6.4(h). Moreover, as detailed above, the concept of a "voluntary termination" (which, as detailed above, is intended to address the event of an employee resigning instead of facing a termination for cause) is explicitly *excluded* from the definition of Voluntary Resignation. Plainly, regardless of whether termination is "voluntary" or "involuntary," both scenarios refer to a company-initiated termination and not a purely volitional resignation.

---

[13] Separately, SandRidge notes that all of the references to voluntary termination cited by Giesler appear in Article 6 of the Employment Agreement, dealing with Stock Options, rather than Article 7, which deals with Restricted Stock, as is at issue here.

*Finally*, Giesler argues that SandRidge's interpretation leads to an absurd result because "under SandRidge's interpretation, Giesler would be entitled to the full Initial RSU Grant by simply quitting on day one, since (according to SandRidge) the forfeiture language would not have been triggered by a voluntary resignation by Giesler." Mot. at 20–21. But Giesler misunderstands the way Restricted Stock Units work under the Incentive Plan, which the Employment Agreement incorporates by reference. While Giesler was granted 1 million *Restricted* Stock Units on the first day of his contract, those stock units do not *vest* until each anniversary *so long as he remains employed by the Company*. *See* Incentive Plan § 7.3(c).[14] Thus, because the shares are still subject to restriction until they vest, Giesler forfeits any unvested shares upon his departure.

When viewed in context with the Parties' entire agreement and intent, "termination" as it is used in the Long-Term Incentive Award unambiguously excludes resignation.

## II.   Even Assuming an Ambiguity Exists, SandRidge's Compensation Committee Exercised its Authority to Resolve that Ambiguity and Concluded that the Vesting Formula Does Not Apply in the Event of a Voluntary Resignation.

In the alternative, should the Court accept Giesler's interpretation as a reasonable one (which it should not), the provision is at least ambiguous in light of SandRidge's

---

[14] While the Incentive Plan refers to "Termination," such capitalized term is defined and intended to include voluntary resignation, a necessary modification because resignation is not included within the word's common usage. By contrast, the Parties expressly used the lower case "termination" in the Employment Agreement, intending it to apply in its common usage—*i.e.*, termination by the Company. Such a distinction is emphasized in numerous provisions of the Incentive Plan. *See, e.g.*, Incentive Plan §§ 2.5, 6.4(g), 6.4(h), 6.4(i), 13.3. Indeed, SandRidge's Compensation Committee explicitly distinguished between lower case "termination" and capitalized "Termination" in its determination that "employment is terminated" does not include voluntary resignation. *See* Committee Letter at 2.

plainly reasonable interpretation (*see* Section I, *supra*).  *See Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 545–46 (Okla. 2003) ("A contract is ambiguous if it is reasonably susceptible to at least two different constructions.").  Critically, however, SandRidge's Compensation Committee has already resolved any alleged ambiguity in good faith and determined that "employment is terminated," as it is used in the Employment Agreement, does not include a voluntary resignation.  This decision was final and binding pursuant to plain language of the Parties' agreement.

> The Incentive Plan provides in Section 3.3 that:

> the Committee shall have the authority . . . to construe and interpret the terms and provisions of the Plan and any Award issued under the Plan (and any Award Agreements relating thereto). . . . The Committee may correct any defect, supply any omission or reconcile any inconsistency in the Plan or in any agreement relating thereto in the manner and to the extent it shall deem necessary to effectuate the purpose and intent of the Plan."  Incentive Plan § 3.3.

> It continues in Section 3.4 that:

> [a]ny decision, interpretation or other action made or taken in good faith by or at the direction of the Company, the Board or the Committee (or any of its members) arising out of or in connection with the Plan shall be within the absolute discretion of all and each of them, as the case may be, and shall be final, binding and conclusive on the Company and all employees and Participants and their respective heirs, executors, administrators, successors and assigns.

*Id.* § 3.4.

> Here, on August 6, 2021, after it "carefully considered all relevant facts, documents (including the Plan, the Demand Letter and the Employment Agreement, which contains the terms of Mr. Giesler's RSU award and constitutes his Award Agreement (as defined under the Plan)), and the circumstances of Mr. Giesler's voluntary resignation from the

Company," SandRidge's Compensation Committee exercised its express authority and "reject[ed] Mr. Giesler's claim that he is entitled to vesting of an additional portion of the Initial RSU Grant that remained unvested when [he] quit as the Company's Chief Executive Officer ("CEO")."  Committee Letter at 1.

The undisputed evidence shows the Committee's conclusion was made in good faith, as the Committee specifically detailed to Giesler the many reasons why it concluded that his reading of the Long-Term Incentive Award was illogical and counter to the Parties' intent.  For example, the Committee highlighted, among other things, that "[w]hen the [Incentive] Plan intends for employment termination to include a resignation, the [Incentive] Plan explicitly so states," that "[SandRidge's] interpretation is consistent with, and supported by, all publicly-filed descriptions of Mr. Giesler's Employment Agreement and the terms of the Initial RSU Grant set forth therein," and that "[i]t is commonly understood that equity awards of this type are retentive in nature and intended to encourage Company employees to remain with the Company, not quit to take a new job with another company."  *See* Committee Letter at 1–2.  Based on its carefully reasoned analysis, the Committee interpreted the Long-Term Incentive Award in good faith and determined that the phrase "employment is terminated" does not include a voluntary resignation.  *Id.*  The Committee's conclusion is final and binding on this point based on the undisputed facts and therefore supports summary judgment for SandRidge.  *See* Incentive Plan § 3.4.[15]

---

[15] Although the undisputed evidence permits summary judgment for SandRidge on this alternative basis, should the Court determine the Committee's good faith is a disputed issue of fact, that dispute would preclude summary judgment for Giesler.

Giesler makes three unpersuasive arguments why the Compensation Committee cannot interpret the language of the contract. *First*, Giesler contends that the Committee cannot interpret ambiguities in the Employment Agreement, despite the express authority provided to it by the Incentive Plan, because the third sentence of the Long-Term Incentive Award includes the phrase, "[n]otwithstanding the preceding sentence." Mot. at 22. This argument fails because this clause is contained within the third sentence and limits only the *second* sentence, not the *first* sentence of the provision (*i.e.*, it only limits the "preceding" sentence), which provides that the award is being granted "under the 2016 Omnibus Incentive Plan (As Amended and Restated as of August 8, 2018)." Employment Agreement ¶ 5. And the purpose of the "notwithstanding" clause is to nullify the vesting schedule in the preceding sentence under certain conditions detailed in the third sentence, not to negate in full the application of the Incentive Plan. *Id.* And of course, the sentence does not specifically mention the Compensation Committee or its authority to interpret the Employment Agreement. Even Giesler acknowledges that the Incentive Plan applies to the Employment Agreement, an admission that is inconsistent with his position that the notwithstanding clause nullifies the application of the Incentive Plan in full. *See*, *e.g.*, Mot. at 19 ("[T]he Omnibus Incentive Plan, which the Employment Contract generally incorporates by reference . . . .").

*Second*, Giesler argues that "'notwithstanding' the Compensation Committee's authority to interpret the Omnibus Incentive Plan, that authority cannot unilaterally impair a party's contract rights without that party's consent" and that SandRidge is "retroactively adopt[ing] its own self-serving contract interpretation." Mot. at 21–24. But Giesler's

argument is, once again, circular.  The Committee is not impairing Giesler's rights if those rights never existed.  And merely disagreeing with Giesler does not amount to the Committee "retroactively adopt[ing] its own self-serving contract interpretation."  By that logic, the Committee's only option would be to interpret all ambiguities in Giesler's favor or risk "impairing his rights."  This makes no sense and would effectively nullify the purpose of giving the Committee the right to interpret the agreement.  Instead, the Committee's discretion is limited by the next provision, which requires the Committee to make its interpretations "in good faith."  Incentive Plan § 3.4.  The unrefuted evidence demonstrates good faith here, permitting summary judgment for SandRidge on this alternative basis; however, should the Court determine the Committee's good faith is a disputed issue of fact, that dispute would preclude summary judgment for Giesler.

*Finally*, Giesler argues that the terms of the Employment Agreement override the terms of the Incentive Plan because of a provision that provides that the Agreement governs if inconsistent with another agreement.  Mot. at 24.  But this argument, once again, presupposes that Giesler's interpretation is correct and that the Committee's decision was inconsistent with the terms the Employment Agreement.  As described above, the Committee's interpretation of the Employment Agreement is not inconsistent with, but rather gives effect to, the plain intention of the Parties—to financially incentivize Giesler to remain as CEO of SandRidge for three full years.

## III.   Discovery is Necessary to Resolve Any Remaining Ambiguity.

As detailed above, if the Court overlooks the flaws in Giesler's out-of-context reading of the term "employment is terminated" and finds the Long-Term Incentive Award

ambiguous, and assuming, *arguendo*, that SandRidge's Compensation Committee does not have the authority to interpret such ambiguity, discovery would be necessary to resolve this dispute by ascertaining the Parties' intent and the meaning of the phrase "employment is terminated" as it is used in the Long-Term Incentive Award. *See* Okla. Stat. tit. 15 § 163; *Plano Petroleum, LLC v. GHK Expl. L.P.*, 250 P.3d 328, 331 (Okla. 2011) (finding it error that "[i]nstead of resolving the ambiguity. . . . the lower courts merely chose between the two interpretations . . . without the benefit of extrinsic evidence"); *QuikTrip Corp. v. Abatement Sys., Inc.*, 281 P.3d 250, 258 (Okla. Civ. App. 2012) ("Where the meaning of an ambiguous written contract is in dispute, evidence of extrinsic facts and circumstances throwing light on the intention of the parties is admissible."). To that end, SandRidge has already served Requests for Production and Interrogatories on Giesler directed toward the extrinsic circumstances surrounding the negotiation of the Long-Term Incentive Award. The Court should at very least allow discovery before rejecting SandRidge's reasonable interpretation or its argument that the committee's decision was made in good faith, both issues that would preclude summary judgment for Giesler at this stage. For this reason, Giesler's Motion should be denied as premature.

## IV.   Giesler's Position that He is Entitled to "284,323 Restricted Stock Units, Settled in Shares of SandRidge Common Stock" is Incorrect.

As a final matter, while the issue is not yet ripe, SandRidge disputes Giesler's claim in his Motion that he is entitled to judgment in his favor "settled in shares of SandRidge common stock." Mot. at 25. It is black letter law that specific performance is an equitable remedy and is available only when monetary damages would not adequately compensate

the plaintiff, a standard which Giesler's motion does not even attempt to satisfy.  *See Russell v. Bd. of Cnty. Comm'rs of Carter Cnty.*, 1 P.3d 442, 445 (Okla. Civ. App. 2000) ("Where there is an adequate remedy at law, equity does not grant specific performance." (quoting *Fortner v. Wilson*, 216 P.2d 299, 303 (Okla. 1950))).

Here, because SandRidge's common stock is readily available and publicly traded on the New York Stock Exchange, specific performance is plainly unwarranted.  *See, e.g., Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) (declining to award specific performance of common stock because "[t]here is simply no reason why, assuming a jury finds [the company] liable for breach of contract, money damages would not adequately compensate [the employee] for [the company's] breach"); *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 302 (S.D.N.Y. 2010) ("In the case of publicly traded stock, specific performance is not appropriate because there is no reason why money damages would not adequately compensate [for] breach."); *cf. Chadwell v. English*, 652 P.2d 310, 314 (Okla. Civ. App. 1982) (affirming specific performance where "the stock existed in extremely low volume, was not traded in a ready market, and was seldom exchanged").

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court deny Plaintiff's Motion for Partial Summary Judgment and grant Defendant's Cross-Motion for Partial Summary Judgment.

Dated: January 27, 2022              Respectfully submitted,

  s/     Seth E. Spitzer

Chad B. Walker (admitted *pro hac vice*)
John T. Sullivan (admitted *pro hac vice*)
**WINSTON & STRAWN LLP**
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
Telephone: (214) 453-6500
Facsimile: (214) 453-6400
Email: cbwalker@winston.com
Email: jsullivan@winston.com

Seth E. Spitzer (admitted *pro hac vice*)
Adam P. Moskowitz (admitted *pro hac vice*)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: sspitzer@wintston.com
Email: apmoskowitz@winston.com

L. Vance Brown
**ELIAS, BOOKS, BROWN & NELSON, P.C.**
Two Leadership Square
211 North Robinson, Suite 1300
Oklahoma City, OK 73102-7149
Phone: (405) 232-3722
Facsimile: (405) 232-3746
Email: vbrown@eliasbooks.com

*Counsel for SandRidge Energy, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2022, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants.

> Phillip G. Whaley
> Ryan Whaley Coldiron Jantzen Peters &Webber PLLC
> 400 N. Walnut Ave
> Oklahoma City, OK 73104
> 405-239-6040
> pwhaley@ryanwhaley.com
>
> Brandon T. Allen
> Reynolds Frizzell LLP
> 1100 Louisiana St
> Suite 3500
> Houston, TX 77002
> 713-485-7200
> ballen@reynoldsfrizzell.com
>
> Jean C. Frizzell
> Reynolds Frizzell LLP
> 1100 Louisiana St
> Suite 3500
> Houston, TX 77002
> 713-485-7200
> jfrizzell@reynoldsfrizzell.com

> s/      Seth E. Spitzer
> Seth E. Spitzer