August 26, 2021

**VIA FEDERAL EXPRESS AND EMAIL**
Brandon T. Allen
Reynolds & Frizzell LLP
1100 Louisiana
Suite 3500
Houston, TX 77002
ballen@reynoldsfrizzell.com

   Re: Carl Giesler, Jr.

Dear Mr. Allen,

  We are in receipt of your July 27, 2021, letter in which you state that your client, Carl Giesler, Jr., believes he is entitled to 284,323 Restricted Stock Units ("RSUs") pursuant to the terms of his April 6, 2020, employment agreement (the "Employment Agreement"). Capitalized terms used in this letter, but not otherwise defined herein, shall have the meanings ascribed to such terms in the 2016 Omnibus Incentive Plan (As Amended and Restated as of August 8, 2018) (the "Plan").

  As you know, Mr. Giesler's Employment Agreement with SandRidge Energy, Inc. (the "Company") provided that an Award of 1,000,000 RSUs, subject to vesting conditions set forth therein (the "Initial RSU Grant"), was made pursuant to the Plan and subject to the terms and conditions thereof. The Plan, in turn, gives the Compensation Committee the absolute discretion and authority to construe and interpret terms and provisions of the Plan and any Award issued pursuant thereto. Your letter postulates that in addition to the 333,334 RSUs from the Initial RSU Grant that vested on April 6, 2021, Mr. Giesler would like 284,323 additional RSUs as a result of Mr. Giesler quitting his job to take a position with another company.

  The Committee met on Friday, August 6, 2021, to review your letter, Mr. Giesler's Employment Agreement (which contains the terms of the Initial RSU Grant Award and thus constitutes Mr. Giesler's Award Agreement), the Plan, and the circumstances of Mr. Giesler's voluntary resignation from the Company. The Committee carefully considered all of the relevant documents and facts, as well as the arguments made by you on behalf of your client, at its August 6th meeting and in subsequent discussions.

  The Committee hereby informs you that it unanimously rejects Mr. Giesler's claim that he is entitled to vesting of an additional portion of the Initial RSU Grant that remained unvested when your client quit as the Company's Chief Executive Officer ("CEO"). The Employment Agreement provides that a portion of unvested RSUs underlying the Initial RSU Grant will vest only if Mr. Giesler's employment is "terminated" for a reason other than Cause. The Committee interprets the term "terminated" as used in the Employment Agreement to mean an involuntary termination initiated by the Company, not a voluntary resignation initiated by Mr. Giesler to take a job with another company. The Committee's interpretation of the Plan and Mr. Giesler's Employment Agreement is supported by the following facts, among others:

1. When the Plan intends for employment termination to include a resignation, the Plan explicitly so states (compare, for example, the "Good Reason" definition referencing "resignation", in Section 2.22 of the Plan, versus the "Cause" definition, referencing only "termination," in Section 2.5 of the Plan).

2. When the Plan intends for employment termination to include an employee-initiated voluntary separation, the Plan explicitly so states (compare, for example, Section 6.4(g) of the Plan referencing "involuntary" versus Section 6.4(h) of the Plan referencing "voluntary").

3. When the Plan uses a lower case "t" to describe the termination of employment, it denotes a Company-initiated involuntary termination (*see*, for example, the definition of "Cause" and Section 13.3 of the Plan).

4. In light of the above three points, if it was the Committee's intention to provide that Mr. Giesler would receive vesting of the additional RSUs upon a voluntary resignation, then Mr. Giesler's Employment Agreement would have explicitly used the term "voluntary resignation," which it did not.

5. The Committee's interpretation is consistent with, and supported by, all publicly-filed descriptions of Mr. Giesler's Employment Agreement and the terms of the Initial RSU Grant set forth therein.

6. In fact, Mr. Giesler, the Company's shareholders, and institutional shareholder advisory firms agreed with the Committee's description and interpretation of the Employment Agreement and the terms of the Initial RSU Grant. Mr. Giesler reviewed and signed the Company's 2021 definitive proxy statement (the "Proxy"), which contained a summary of his Employment Agreement and the vesting conditions applicable to the Initial RSU Grant. Notably, that summary did not state that the Company was providing its CEO with an off-market, incentive equity walk-away vesting right in connection with a voluntary resignation – and for good reason. As a publicly traded company, the Company is subject to a shareholder advisory vote ("Say-on-Pay Vote") on the compensation paid to its named executive officers, including Mr. Gielser before he quit, and the Company further must make detailed disclosures pursuant to the rules promulgated by the U.S. Securities and Exchange Commission. Had the Committee and Mr. Giesler adopted the interpretation of the terms of the Initial RSU Grant contained in your letter, there would have been disclosure of the arrangement in the Proxy as such a vesting condition would be material to a shareholder's understanding of Mr. Giesler's compensation, since it is dilutive to shareholders and does not align with established market-based best practices. Furthermore, had the Initial RSU Grant provided for the vesting feature suggested in your letter, there would have been substantial discussion of this very atypical arrangement by institutional shareholder advisory firms in the reports they prepare and/or by institutional shareholders on the one hand, and the Company's investor relations team and proxy solicitors on the other. Instead, consistent with the Proxy approved and signed by Mr. Giesler, Institutional Shareholder Services ("ISS") and the Company's shareholders voted yes on our Say-on-Pay Vote in 2021 without any discussion, including in ISS's Proxy Analysis & Benchmark Policy Voting Recommendations report, of a novel incentive equity award that rewards a CEO upon voluntary resignation.

7. It is commonly understood that equity awards of this type are retentive in nature and intended to encourage Company employees to remain with the Company, not quit to take a new job with another company.

The Committee also considered the fact that (a) no director or officer of the Company, including Mr. Giesler, ever discussed, considered, or suggested including in the Proxy Statement (which Mr. Giesler voted in favor of approving) that Mr. Giesler was entitled to receive the additional shares you identify in your letter and (b) Mr. Giesler did not file a Form 4 reflecting his recently articulated position on additional RSU vesting. As Mr. Giesler is aware, Form 4 and a complete and truthful Proxy Statement would both be

required under applicable securities laws if Mr. Giesler had believed his current position was supported by the Employment Agreement and the Plan.[1]

Because your client quit his position as CEO of the Company, he did not have his employment "terminated" by the Company "for any reason other than Cause." Accordingly, consistent with the Committee's interpretation, Mr. Giesler is not entitled to the vesting of any RSUs in connection with his quitting his position as CEO of the Company.

Pursuant to Section 3.4 of the Plan, the Committee's decision set forth herein is final, binding, and conclusive.

Sincerely,

Patricia A. Agnello, Esq.
Chairman of the Committee

Cc: Jonathan Frates, Committee Member
Randolph C. Read, Committee Member

---

[1] In addition, the Committee also considered the theory set forth in your letter that in preparing draft separation papers, a Company human resources consultant allegedly interpreted Section 5 of Mr. Giesler's Employment Agreement as providing for vesting of additional RSUs triggered by Mr. Giesler quitting. As stated at the outset of this letter and as explicitly articulated within the Plan, only the Committee has the power to interpret the Plan and the terms of Awards thereunder. Neither the Committee, nor any of its members (or other members of the Company's Board of Directors), ever delegated such authority to any human resources consultant, and thus, even if true, such unnamed individuals' view regarding the meaning of the agreement is irrelevant.